```
 1              IN THE UNITED STATES DISTRICT COURT

 2          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

 3                        AT CHARLESTON

 4   _____x

 5   BLUESTONE COAL CORPORATION,           :
     a West Virginia Corporation; and      :
 6   DOUBLE-BONUS MINING COMPANY,          :
     a West Virginia Corporation,          :
 7                       Plaintiffs,       :
                                           :
 8                         -vs-            : CIVIL ACTION
                                           : NO. 2:16-cv-06098
 9   PINNACLE MINING COMPANY, LLC.,        :
     a Delaware Corporation; and TARGET    :
10   DRILLING, INC., a Pennsylvania        :
     Corporation; SENECA COAL RESOURCES,   :
11   LLC, a Delaware Limited Liability     :
     Company; SENECA NORTH AMERICAN COAL,  :
12   LLC, (SNAC), a Delaware Limited       :
     Liability Company; CLIFFS NATURAL     :
13   RESOURCES, INC., an Ohio Corporation;:
     TAM INTERNATIONAL, INC., a Delaware   :
14   Corporation; and C&J Well Services,   :
     Inc., a foreign corporation licensed  :
15   to do business in West Virginia under :
     the trade name of C&J Energy Services:
16                       Defendants.       :
     _____x
17

18              TRANSCRIPT OF MOTION HEARING
           BEFORE THE HONORABLE DWANE L. TINSLEY,
19              UNITED STATES MAGISTRATE JUDGE
                      AUGUST 14, 2018
20

21

22   APPEARANCES:
     For the Plaintiffs:
23                         R. SCOTT LONG, ESQ.
                           DAVID F. NELSON, ESQ.
24                         Hendrickson & Long
                           P. O. Box 11070
25                         Charleston, WV 25339
```

```
1     CONTINUED APPEARANCES:

2     For the Defendants
      Pinnacle and Seneca:
3                                JOSHUA A. BERMAN, ESQ.
                                 White & Case
4                                1221 Avenue of the Americas
                                 New York, NY  10020-1095
5

6                                RONALD K. GORSICH, ESQ.
                                 White & Case
7                                Suite 2700
                                 555 South Flower Street
8                                Los Angeles, CA 90071

9

10    For the Defendants
      Pinnacle and Seneca:
11                               JOHN J. MEADOWS, ESQ.
                                 Steptoe & Johnson
12                               P. O. Box 1588
                                 Charleston, WV 25326-1588
13

14                               DOUGLAS C. LASOTA, ESQ.
                                 Marshall Dennehey Warner
15                               Coleman & Goggin
                                 Suite 700
16                               501 Grant Street
                                 Pittsburgh, PA  15219
17

18    For the Defendant
      Cliffs Natural
19    Resources, Inc.:
                                 DENNIS R. ROSE, ESQ.
20                               Hahn Loeser & Parks
                                 Suite 2800
21                               200 Public Square
                                 Cleveland, OH 44114
22

23                               THOMAS M. HANCOCK, ESQ.
                                 Nelson Mullins
24                               949 Third Avenue,
                                 Suite 200
25                               Huntington, WV 25701
```

```
 1     CONTINUED APPEARANCES:

 2     For the Defendant
       TAM International:
 3                                    DIANA LEIGH JOHNSON, ESQ.
                                      Bowles Rice
 4                                    P. O. Box 1386
                                      Charleston, WV 25327-1386
 5

 6

 7     For the Cross Defendant
       Ken & Coy Rock Company:
 8                                    JOHN L. MACCORKLE, ESQ.
                                      MacCorkle & Lavender
 9                                    P. O. Box 3283
                                      Charleston, WV 25332
10

11

12

13

14

15

16

17

18

19

20

21

22             Proceedings recorded by mechanical stenography,
       transcript produced by computer.
23             _____
               CATHERINE SCHUTTE-STANT, RDR, CRR
24              Federal Official Court Reporter
              300 Virginia Street, East, Room 6009
25                  Charleston, WV 25301
```

Bluestone v Pinnacle, et al.

```
 1              PROCEEDINGS had before The Honorable Dwane L.
 2    Tinsley, United States Magistrate Judge, United States
 3    District Court for the Southern District of West Virginia,
 4    at Charleston, on August 14, 2018, as follows:
 5              THE CLERK:  All rise.  This Honorable Court is now
 6    in session.  Please be seated and come to order.
 7              THE COURT:  Good afternoon.
 8              GROUP RESPONSE:  Good afternoon, Your Honor.
 9              THE COURT:  We're here this afternoon in the
10    matter of Bluestone Coal Corporation and Double-Bonus Mining
11    Company versus Pinnacle Mining Company, Target Drilling,
12    Seneca Coal Resources, Seneca North American Coal, Cliffs
13    Natural Resources, TAM, T-A-M, TAM International, and
14    C&J Well Services, Civil Action Number 2:16-cv-06098.
15         Would counsel please note their appearances for the
16    record, please.
17              MR. LONG:  Your Honor, Scott Long for plaintiffs.
18              MR. NELSON:  Your Honor, David Nelson for
19    plaintiffs.
20              THE COURT:  And for the defendants.
21              MR. BERMAN:  Good afternoon , Judge.  Josh Berman
22    of White & Case, for defendants Pinnacle and Seneca.
23              MR. GORSICH:  Your Honor, Ron Gorsich with
24    White & Case for Defendants Pinnacle and Seneca.
25              MR. MEADOWS:  Good afternoon, Your Honor.  John
```

Bluestone v Pinnacle, et al.

```
 1    Meadows with Steptoe & Johnson on behalf the defendants,
 2    Pinnacle and Seneca.
 3              THE COURT:  All right.  Thank you, gentlemen.  I
 4    hope I can remember your names, but, if not, you all just
 5    correct me.
 6              MR. BERMAN:  Your Honor, we have one more
 7    appearance.  I'm sorry.
 8              MR. LASOTA:  Doug LaSota on behalf of Pinnacle and
 9    Seneca, as well, Your Honor.
10              THE COURT:  What is your name, sir?
11              MR. LASOTA:  Doug LaSota, L-A-S-O-T-A.
12              THE COURT:  All right, got it.  Like I said, I
13    will try to remember your names, but if I don't, please let
14    me know.
15         Before we get started, I just wanted to make sure the
16    parties know, in particular, the attorneys from out of
17    state, that I used to be employed with the law firm of
18    Hendrickson & Long.  And I was employed there from 2001 to
19    2013, when I became United States Magistrate Judge.
20         When I came to the bench, I had Hendrickson & Long on
21    my recusal list.  And they were on my recusal list for maybe
22    two, maybe three years, at the most.
23         And so for this reason, I wanted to make sure all the
24    parties knew of my former affiliation with Hendrickson &
25    Long, and to find out whether any attorneys for both sides,
```

```
 1    in particular, the defendants, especially for the attorneys

 2    out of state, if they have any concerns or problems with

 3    this Court, with me sitting in this matter.

 4              MR. BERMAN:  No, sir, no problems at all.

 5              THE COURT:  And is that from all of the

 6    defendants?

 7              MR. BERMAN:  That's on behalf of all of the

 8    defendants.

 9              THE COURT:  All right.  And I will take it that

10    the defendants will waive --

11              MR. BERMAN:  Oh, I'm sorry.  On behalf of my two

12    clients, Your Honor, Pinnacle and Seneca.  Sorry to

13    interrupt you.  There are representatives of the other

14    defendants in the room, and I will let them speak for

15    themselves.

16              THE COURT:  All right.  I'd like to hear from

17    them, because I need for the attorneys to state on the

18    record that they waive any concerns or objections for me

19    sitting in this case.  And I want to make sure the attorneys

20    are aware that my only involvement is probably going to be

21    just on the discovery matters.  The remainder of this case

22    is going to be handled by Judge Johnston, who is the Chief

23    District Court Judge, who is in charge of this case.

24              MR. ROSE:  Your Honor, Dennis Rose for Cleveland

25    Cliffs, and we have no objection to you hearing this matter.
```

```
 1              THE COURT:  All right.  Anyone else?

 2              MS. JOHNSON:  Diana Johnson from Bowles Rice for

 3     TAM International, and no objection.

 4              MR. MACCORKLE:  John MacCorkle for Ken & Coy, and

 5     I have no objections, Your Honor.

 6              THE COURT:  Anyone else?

 7          (No response.)

 8              THE COURT:  So I'm assuming that covers all the

 9     defendants:  Pinnacle Mining.

10              MR. BERMAN:  Yes, sir.

11              THE COURT:  Target Drilling.

12              MR. LONG:  They're dismissed.

13              THE COURT:  They're dismissed, that's right.

14              Seneca Coal Resources.

15              MR. BERMAN:  Yes, sir.

16              THE COURT:  North American Coal Company.

17              MR. BERMAN:  Yes.

18              MR. GORSICH:  Yes.

19              THE COURT:  Cliffs Natural Resources.

20              MR. ROSE:  Yes.

21              THE COURT:  TAM International.

22              MS. JOHNSON:  Yes.

23              THE COURT:  And C&J Well Services.

24              MR. LONG:  They've been dismissed, too.

25              MR. NELSON:  They're dismissed.
```

Bluestone v Pinnacle, et al.

```
1                THE COURT:  Okay.  And based on the

2    representations, everyone waives any concerns or objections

3    to this Court handling this matter?

4                MR. BERMAN:  Yes, Your Honor.

5                THE COURT:  All right.  Thank you, gentlemen, and

6    lady.

7         We're here today to address defendant Pinnacle Mining

8    Company's Motion to Compel, ECF No. 117.

9         The plaintiffs have responded to this motion, ECF

10   No. 127, and the defendant Pinnacle Mining filed a reply,

11   ECF 129.

12        On July 23rd, 2018, the plaintiffs filed a motion for

13   leave to file supplemental exhibit and response to the

14   Motion to Compel, ECF No. 190.

15        And on August 3rd, 2018, the defendants Seneca Coal and

16   Seneca North American filed a response.

17        On August 3rd, 2018, defendant Pinnacle Mining Company

18   and Seneca Coal Resources and Seneca North American Coal

19   filed a combined response to plaintiffs' motion and filed a

20   motion for leave to file supplemental exhibits to its Motion

21   to Compel.  And that was to compel an inspection.  And

22   that's ECF No. 205.

23        And the Court would note that with the motion, the

24   defendant attached an inspection plan.

25        On August 10, 2018, plaintiffs -- plaintiffs filed a
```

1   response to Seneca and Pinnacle's motion for leave to file a

2   supplemental exhibit to Pinnacle Mining Company's Motion to

3   Compel an inspection.

4        And then the plaintiffs filed a motion for leave to

5   file a supplemental exhibit.

6        And Pinnacle Mining Company also filed a motion for

7   leave to file a supplemental exhibit to Motion to Compel

8   Inspection, which is ECF No. 205.

9        And the Court is going to grant both of those motions

10  to file supplemental exhibits, because the Court has

11  reviewed those exhibits for purposes of this hearing today.

12       Now, I understand that some of the parties wanted to

13  present testimony today and have witnesses here to testify.

14       MR. BERMAN:  If necessary, and if it's helpful to

15  Your Honor.

16       THE COURT:  Well, I was just going to say that the

17  Court does not think testimony is needed as of today.

18  However, we can revisit that at a later date if necessary.

19       Because my concern here today is that we're not trying

20  this case today.  This case only deals with the Motion to

21  Compel, and I know both sides have experts that they want to

22  provide testimony, but from my review of the pleadings, I

23  think counsel have done a good job in explaining their

24  respective positions.

25       So, at this time, I don't want to hear any testimony,

Bluestone v Pinnacle, et al.

```
 1    but we can revisit that.  Because my main focus here today,

 2    which appears to be the Motion to Compel the Inspection of

 3    the Mine.  And if I'm mistaken, please tell me if I'm

 4    mistaken, but based on my review of the pleadings, I believe

 5    we're here just on the Motion to Compel.

 6         Is that correct?

 7              MR. BERMAN:  Yes, sir.

 8              MR. LONG:  Yes, Your Honor.

 9              THE COURT:  Now, it appears in reviewing the

10    pleadings that not until August 3rd, 2018, was there any

11    proposal for an inspection plan.  And I think the defendants

12    have now presented an inspection plan.

13         Is that correct, Mr. Long, or, Mr. Nelson?

14              MR. LONG:  Your Honor, we would agree that they

15    submitted an unverified, unsigned, unsealed proposal.

16              THE COURT:  Okay.

17         Now, to the defendants' counsel, I have a question:

18    What took so long to present some type of inspection plan,

19    because that seems to have been the holdup, and it's my

20    understanding that this case has been dragging on for nearly

21    two years.  I think I looked at an order that Judge Johnston

22    just entered a few days ago, where he extended all the

23    deadlines for 60 days, but he refused to extend it beyond

24    that.

25              MR. BERMAN:  Correct, sir.  Subject to Your
```

Bluestone v Pinnacle, et al.

1      Honor's ruling relative to the Motion to Compel, which,

2      during the telephonic hearing, Judge Johnston indicated that

3      he understood if the Motion to Compel is granted, that would

4      necessarily have an effect on the scheduling order, but --

5              THE COURT:  In addition to -- beyond the 60 days?

6              MR. BERMAN:  Beyond the 60 days.

7              THE COURT:  All right.

8              MR. BERMAN:  But -- and so, in fact, if it's

9      helpful for Your Honor to know, one of the things I

10     suggested to Judge Johnston is that he may want to focus, in

11     addition to the motion to extend the trial schedule, also to

12     focus and take up the present Motion to Compel, because they

13     go so much hand-in-glove.

14         And he said, no, that's -- I'm not going to do that.

15     I'm going to leave the Motion to Compel to Judge Tinsley,

16     and if that affects my scheduling order, then we'll address

17     whatever the effect is at that time.

18         But, Your Honor, if I may?  You asked a poignant

19     question, and I'm very glad to have the opportunity to

20     answer you.

21             THE COURT:  All right.

22             MR. BERMAN:  The case, the caption --

23             THE COURT:  Could you state your name for the

24     record, for the court reporter and for the Court.

25             MR. BERMAN:  Yes, sir.  My name is Josh Berman.

1    And I'm here on behalf of Pinnacle and Seneca.

2               THE COURT:  All right, Mr. Berman, thank you.

3               MR. BERMAN:  The index number, Judge, shows that

4    the case is two years old.  But that alone creates a bit of

5    a misleading impression of what's gone on for two years.

6         The fact is that in July of 2016, the case was filed.

7    And in March of 2017, the plaintiffs filed an amended

8    complaint, which, to a meaningful extent, changed the

9    complexion of the litigation, added additional parties and

10   so forth.

11        And it wasn't until the very end of the year, in 2017,

12   that all of the parties had appeared in the case and began

13   to file answers to the plaintiffs' amended complaint.

14        Now, that's still a year and a half ago.  I understand

15   that.  But -- I'm sorry, that's not a year and a half ago --

16   that's still nine months ago.

17        The first discovery that was served at all in this case

18   was served in November of 2017, so eight months and change.

19               THE COURT:  So it hasn't even been a year yet?

20               MR. BERMAN:  Hasn't even been a year of discovery.

21   In addition to that, we all took a break to allow for a

22   mediation that occurred a month ago at Mr. Meadows' offices.

23   So we had pins down relative to discovery among the parties

24   for a period of -- I think it was nearly two months.

25               MR. GORSICH:  Couple months, yes.

1              MR. BERMAN:  So the true amount of time that the

2     parties have spent on discovery in this case is less than

3     six months.

4         I think the Court is aware, Your Honor is aware of the

5     damages in the case -- although, there has been some

6     variation -- are something on the order of half a billion

7     dollars.  And whether the number goes to $400 million or it

8     rises to $600 million, if we lose the case, it's over, and

9     there are 400 miners and their families who are out of work.

10    That's a bankruptcy number for Pinnacle and for Seneca.

11        Judge, in March of this year, March 2018, so that's

12    only four months into the actual exchange of discovery

13    between and among the parties, my clients filed a notice to

14    inspect the asset itself, the Double-Bonus mine that -- that

15    the plaintiff alleges my client flooded and ruined.

16        Now, I want to be very direct.  We expected that there

17    may be a fight over who pays for the dewatering and the

18    degassing of the mine, because there is a substantial

19    expense there.  That is something we foresaw.

20        Now, it is our view, of course, that the plaintiff

21    would bear the burden of proof, Bluestone ought to have paid

22    for it, they ought have been doing this on their own,

23    without a Notice of Inspection, just to meet their burden of

24    proof.

25              THE COURT:  Well, isn't it true, Mr. Berman, that

1    in most civil cases, when a person is sued, and the

2    defendant wants to do any type of inspection or anything,

3    that they are responsible for paying for it?

4              MR. BERMAN:  Well, we -- you know what, for

5    purposes of this discussion, let's take that as a given.  I

6    accept that for the moment, subject to some qualifications

7    that I'll give Your Honor later.

8              THE COURT:  Sure.  But you agree with me, that's

9    normally how it's done?

10             MR. BERMAN:  Normally, how it's done, absent

11   multi-million-dollar expense and under the unique

12   circumstances of this case.  And no question, if I were

13   going to go look at a -- a personal injury case, something

14   like that, we would pay for our own doctor, sure.

15             THE COURT:  So there is some exceptions that --

16             MR. BERMAN:  That's where we're going.

17             THE COURT:  Okay.  All right.

18             MR. BERMAN:  But the larger point -- I don't want

19   to derail the Court -- is that we were prompt in filing our

20   motion to inspect the premises.  And from March to -- from

21   March 14 of 2018, when we asked to inspect the premises, the

22   plaintiffs took a month to respond -- a little bit less than

23   a month.  I believe they responded on May -- on April 12th.

24        And the gist of the response was:  No.  We're not going

25   to let you inspect the asset.

Bluestone v Pinnacle, et al.

 1        And we thereafter promptly filed this present motion.

 2    And then there was briefing and so forth, and we've gone now

 3    from March all the way to the end of August.

 4        Now, I am quite confident, Judge, on the basis of our

 5    conversation with our experts, that had Bluestone received

 6    the motion to inspect -- or Motion to Compel Inspection, and

 7    said to us, that's fine, that's certainly a reasonable and

 8    imminently understandable discovery request in the context

 9    of this enormous case in which we've accused you of

10    destroying a half a billion dollars worth of property and

11    assets.  What information do you need?

12        And had Bluestone said, look, we'll work with you --

13    and I'll tell you why that's important, if I may.

14        The federal agency responsible for overseeing any

15    application for dewatering is called MSHA.  I think the

16    Court knows that.

17            THE COURT:  Sure.

18            MR. BERMAN:  Mining Safety and Health.  In my

19    colleague's papers, applications to MSHA sort of presented

20    as if they're sent off to Washington D.C. and to a black box

21    at an agency and you don't know when they're going to come

22    out.  But that's in practice not how that works.

23        There is -- the mines in question are located in what's

24    called District 12.  There is a district manager who is in

25    charge of and responsible for engaging with local operators

1    on these kinds of plans.  I don't have the person's name in

2    front of me -- his name is Brian Dotson.  And there is an

3    ADM, Assistant District Manager named Eddie Bailey, who

4    might review the plan in the first instance.

5        The way this works is, a draft plan is submitted to the

6    local district manager here for District 12, and a

7    conversation ensues.  In other words, Mr. Dotson or someone

8    on his staff would have us in and sit down and say, you

9    know, I think it does appear that you are trying to get out

10   of putting ventilation into such-and-such area of the mine,

11   but I'd like to see a better circulation, or, I want to make

12   sure that there is a lower concentration of methane gas, for

13   instance.  And it would be a collaborative process.

14       Now, this is the rub.  We, as the non-operators of the

15   mine, as the defendants, have no standing.  There is no

16   mechanism for us to engage directly with MSHA.  In other

17   words, we needed the plaintiffs, we needed Bluestone to work

18   with us, because only the plaintiffs, only Bluestone can

19   talk to MSHA about any plan.

20           THE COURT:  Because they own the mine?

21           MR. BERMAN:  Because they are the operator of the

22   mine.  I think the term-of-art is operator of the mine.  And

23   that's actually important, because what I want to say about

24   that, Judge, is there are all sorts of ways around that

25   problem.  One is, this Court could compel Bluestone to work

Bluestone v Pinnacle, et al.

 1    with us.  For instance, my colleague, Mr. Long made a

 2    reference a moment ago to the fact that under a plan we

 3    submitted was unsigned and unverified and unsealed.

 4         Well, one reason for that is that standing here today,

 5    right now, we still have not received a certified mine map

 6    from Bluestone.  So our experts are doing the best they can

 7    with what they have in order to devise a plan.

 8              THE COURT:  And you have not received, what,

 9    from --

10              MR. GORSICH:  A certified mine map.

11              THE COURT:  A mine map?

12              MR. BERMAN:  Yes, a certified mine map.  I said it

13    correctly.

14              THE COURT:  All right.

15              MR. BERMAN:  Now, we do have an auto CAD map, but

16    in order to make progress with MSHA, in order to file a

17    proper application, it has to be accompanied by a certified

18    map.  But the point is, there are all sorts of ways.  So one

19    thing the Court could do is compel us to work together.

20         Another thing that is done, I understand, not

21    infrequently, is we, Pinnacle, could step in as a

22    contractor, and under applicable MSHA regulations and by

23    virtue of being a contractor, we would then qualify under

24    the relevant regs as the operator of the mine and we could

25    then speak directly to Mr. Dotson.

 1      And the way it would work is that our expert, Mr.

 2  Hartsog, who is with us here in the courtroom, and who

 3  drafted the initial plan, which is like an opening salvo,

 4  would send a letter to Mr. Dotson, maybe follow up with a

 5  telephone call.  Mr. Dotson would review the plan.

 6          THE COURT:  And Mr. Dotson works for MSHA?

 7          MR. BERMAN:  That's right, sir.  But importantly,

 8  he's not, you know, a bureaucrat off in Washington; he's

 9  right here.  And he's familiar with --

10          THE COURT:  Well, the question I have, Mr. Berman,

11  in terms of MSHA, based upon the review of the pleadings by

12  the plaintiffs, is that MSHA is saying that it's too

13  dangerous to do any type of inspection on this mine.  So how

14  does that come into play, if MSHA is saying that it's too

15  dangerous, shouldn't do it; and you have someone that says

16  that MSHA would be able to provide you access to it if you

17  had permission or if you were a contractor with the

18  plaintiffs?

19          MR. BERMAN:  I'm glad to answer that, Judge.

20  That's a misstatement of fact.  There is an error in Your

21  Honor's question.

22      MSHA has not given an opinion on what can be done.  The

23  plaintiffs' experts have said Pinnacle's plan is pie in the

24  sky and MSHA will never approve it.

25      The defendants' experts, my clients' experts have said

1    this is entirely commonplace to dewater and degas mines.

2         And I would note something that's very important.  What

3    we are trying to do is dewater the mine sufficient to allow

4    an extremely trained surgical team of mine rescue experts to

5    get into the mine and to examine the integrity of certain

6    barriers that the plaintiffs have alleged were breached and

7    through which water flowed, allegedly, into their mine.

8         Now, you know, a photograph speaks a thousand words.

9    If we can get our -- it's sort of like a SEAL team to get

10   them in there.  Now, getting a mine in shape to do that --

11            THE COURT:  Similar to the situation down in,

12   where the kids --

13            MR. BERMAN:  Down in Thailand.

14            THE COURT:  Thailand, yes, when the kids were

15   stuck in the cave.

16            MR. BERMAN:  Fortunately, there are no children in

17   there.

18            THE COURT:  Right.

19            MR. BERMAN:  But the work that is necessary to get

20   the mine in shape, for a highly-trained team of experts to

21   get in there and do a quick inspection is extremely

22   different than the work that would be necessary to

23   rehabilitate every area of the mine and actually put in

24   working people, you know, 400 miners, rehabilitate the mine

25   and get it up to code and working.

1          Those are apple and oranges.

2          And that's part of what the Court may have seen in our

3    papers.  It is our view that with adequate cooperation from

4    Bluestone, or if we do something more creative, like we step

5    in as a contractor, and thus qualify as an operator of the

6    mine, we could have approval within a month from MSHA, it

7    could be two months, it could be three and a half weeks.

8    But we're not talking about an extraordinarily protracted

9    process.  Because it would be the product of a negotiation

10   with Mr. Dotson -- and his ruling, by the way, under the

11   applicable regulations, is law.  That's MSHA's ruling.  The

12   district managers are empowered to issue rulings, and their

13   decisions are reviewable only under an arbitrary and

14   capricious standard.

15          THE COURT:  Do you need any kind of ruling from

16   EPA, or just need it from MSHA?

17          MR. BERMAN:  Not to my knowledge, just MSHA.

18          THE COURT:  Just MSHA.  All right.

19          MR. BERMAN:  So, you know, there is a funny thing

20   here, if -- now, this is also important, Judge.  I'm told by

21   experts who have done this on dozens of occasions, if the

22   operator of the mine, in this case, Bluestone, is opposed to

23   the plan, then the district manager is very unlikely to --

24   to allow the plan, to approve it.  Because it's sort of like

25   nobody wants to buy a company that's embroiled in

Bluestone v Pinnacle, et al.

1   litigation; it's a messy situation.

2        So what we really need from the Court -- let me

3   withdraw that last statement.

4        The point I wanted to make, Judge, is that had we

5   cooperated from the beginning, meaning from the time in

6   March when we submitted our inspection request, we would --

7   we would very likely be halfway through the dewatering

8   process already.  And so a great deal relative to the timing

9   of this depends on cooperation that we are able to get from

10  our colleagues and counsel for Bluestone.  That's one thing.

11       And, quite frankly, a great deal of the delay relative

12  to this motion, which kicked off with our Notice of

13  Inspection in March, without meaning to cast aspersions, is

14  not our clients' fault.

15       It's a consequence of the fact that Bluestone kept

16  saying, no, no, no, no.  And it's -- I think Your Honor

17  knows our position, which is that -- the experts tell us,

18  and I think I may be in a position that it's the right time

19  and place to explain it to Your Honor, there is simply no

20  way that our borehole could have caused this flooding.  But,

21  right now, we are in a place where the lives of 400

22  families, the lives of 400 families, and half a billion

23  dollars are going to depend on the trial in which we have

24  experts from Bluestone saying, well, we don't know what

25  other event could have caused this.  That's sort of their

 1    fundamental contention.  And experts from our side saying,

 2    there is no way that Pinnacle's borehole could have caused

 3    this flooding.  But no one will be able to say, hey, the

 4    question has been answered; for instance, we took a sample

 5    of the water from the area through which Pinnacle's borehole

 6    went, and we took a sample of the water from Bluestone's

 7    flooded mines, called Double-Bonus, and they've got

 8    different bacteria, meaning it wasn't the borehole.

 9         So there is the water testing.

10         The other thing we could do is check the structural

11    integrity of these barriers, which is an interesting thing

12    about that.  Bluestone is actually required -- you're

13    required to leave about 150 feet of coal barriers when you

14    seal off an area for safety reasons.  And for --

15              THE COURT:  Is that that rock?

16              MR. BERMAN:  Yes.  Would it be helpful for you to

17    see it on a map?  If I may?

18              THE COURT:  Yes, sure.

19              MR. BERMAN:  May I move it closer so Your Honor

20    could see?

21              THE COURT:  You may.  We just need to make sure --

22    will we be able to record that?

23         Dawna, can you pick up on that?  Are we going to --

24    hold on one second.

25         (An off-the-record discussion was held between the

1    Court and Courtroom Deputy.)

2           THE COURT:  I'm sorry, Mr. Berman.  You can go

3    ahead.

4           MR. BERMAN:  Thank you, Judge.

5       What you're looking at -- Your Honor may know this from

6    expertise with coal, but I had to learn it -- but what

7    you're looking at is a top-down view of the Bluestone mine.

8           THE COURT:  Mr. Nelson, Mr. Long, can you all see

9    that?  You all can move if you need to.

10          MR. NELSON:  We're familiar with it.

11          THE COURT:  All right.

12          MR. BERMAN:  Pinnacle's mine -- so this is like

13   this (indicating.)  Right.  Pinnacle's mine, if you will,

14   would be on another poster board back here (indicating).

15      The borehole -- this blue area, Your Honor, is a

16   sealed-off area of Bluestone's mine; meaning, they finished

17   mining it.

18      These little black or shaded gray spots or pillars

19   function as support for the roof of the mine so the whole

20   ground doesn't collapse in.  And right here (indicating),

21   right in this spot is where Pinnacle dug its borehole

22   through to its own mine back here (indicating).

23      And the allegation that we're faced with is that

24   somehow this borehole -- let me back up -- this white

25   barrier -- this yellow portion is the active portion of

Bluestone v Pinnacle, et al.

1    Bluestone's mine.

2         And this white barrier that you see surrounding the

3    sealed-off portion, which is referred to as a district, the

4    white barrier, that surrounds the sealed-off district is

5    what we've been referring to as the -- I called it rock, but

6    it's really, it's a coal barrier.

7         Now, the claim is that when we dug our borehole through

8    to the Pinnacle mine, it caused some form of lateral

9    cracking in these barriers.  Like, you know, you can imagine

10   a drill going into the ground and cracks shooting out to the

11   side.  All the way through the 63-foot rock barrier, coal

12   barrier here, there's been some suggestion that it came in

13   through this barrier here (indicating), and it deluged and

14   completely flooded the entirety of Bluestone's mine.

15        Now, we have independent evidence -- and I don't want

16   to get too far afield here -- showing Bluestone's mine from

17   the get-go had tremendous water problems, but that it was

18   being controlled with the use of very, very powerful

19   dewatering pumps that were located in the deeper sections of

20   the mine.

21        But if we're able to -- this is where we'd enter the

22   mine (indicating), Judge.  And if you think about it as

23   there is a shoreline to a lake here.  If we're able to get

24   -- you can use sort of a mobile fan to get adequate airflow

25   here.  And you would put pumps in the deepest section of the

1    mine and start to pump out the lake, and the shoreline would

2    recede.

3          Now, there is an interesting thing.  This red right

4    here (indicating) is a series of what's called water traps.

5    And if we were to dewater the Bluestone mine just to there,

6    which could take a matter of weeks, and water is continuing

7    to pour out of these traps, then we know the sealed district

8    remains filled with water, and we know that all the water

9    contained in here (indicating), which is from a, you know,

10   an aquifer, a water source, a lake that sits higher

11   somewhere up here, we know that it hasn't seeped through

12   these barriers.  Pure and simple.  I mean it's just basic

13   physics.

14         If we drill here (indicating), and this is basically

15   dry, then it's fairly close to game, set, match as far as

16   causation.

17         So, at any rate, what we'd like to do is get in there

18   and look at the structural integrity.  I mean, this is a

19   nice piece of evidence, but to get in here and look at the

20   structural integrity of this barrier is obviously of

21   critical importance to us, because it just takes away the

22   speculation.

23         So that's a high-level view.  I've probably done that

24   far less eloquently than many of the other individuals in

25   the room could do.

Bluestone v Pinnacle, et al.

1        But to get past that initial area where I showed you

2   with the water traps, that could be a matter of weeks.  And

3   it will certainly give us some strong preliminary

4   information as to, you know, the issue of causation.

5        But, at any rate, I think the fundamental contention

6   here from our standpoint is, given the enormity of the case

7   and enormity of the consequences, we ought to really have

8   the opportunity to look at this.  And Bluestone ought to be

9   compelled to work with us.

10        And at the end of the day, if they're right, their

11   experts are right and this is all Pollyanish and

12   pie-in-the-sky and, hey, we're just crazy for thinking this

13   can be done, well, MSHA will tell us that.

14        Mr. Dotson, who is the federally-appointed expert to

15   make these decisions, will let us know that.  He will say --

16   you know, rather than a court which is expert on the law but

17   not on the mining -- this can't be done.  And then we've got

18   no complaints.

19             THE COURT:  So this plan that you submitted, has

20   anyone from MSHA looked at it as of today?

21             MR. BERMAN:  Not yet, sir, because, again, without

22   Bluestone's assistance, we can't submit it.  We have no

23   standing, which is the source of the Motion to Compel.  We

24   need them to help us.

25             THE COURT:  And you just submitted this plan to

1    Bluestone, what, last week?

2            MR. BERMAN:  Yes.  And the reason we submitted it,

3    actually, it was -- it sort of came about organically.  On

4    the phone call with Judge Johnston, we wound up getting

5    into -- a telephone hearing, I should say -- we wound up

6    getting into sort of a wide-range discussion about the

7    Motion to Compel, what would happen and how it would be.

8        And one of the things my colleagues from Bluestone

9    contended to the Court was, well, Pinnacle hasn't even put

10   together a plan yet.

11       Our response to that is, of course, we didn't want to

12   put together a first draft until we have the necessary

13   materials and the cooperation.  But we didn't want that

14   question to be hanging out there for Your Honor or for Judge

15   Johnston.  And we wanted to make very clear that a plan can

16   be put together.  We did it within a matter of a week or

17   weeks.

18       And, again, Mr. Dotson, the district manager, is not

19   going to take the plan and say, "Approved."  He'll call in

20   our experts and he'll say, you know, I've got some concerns

21   about -- may I approach again?

22            THE COURT:  Yes, sure.

23            MR. BERMAN:  There was, evidently, a fan here

24   during -- a large fan here that ensured airflow kind of

25   shoots down and comes back off these barriers and

1    circulates.  But there was more of a permanent fixture here,

2    a fan, but evidently we've -- now that's been removed.  But

3    that's fine.  So we may face a question from Mr. Dotson

4    about how we intend to ventilate this passageway.

5         And the answer is that they are all a matter of mobile

6    fans of varying sizes and strengths that can be brought in

7    and used as the rescue squad advances through the mine

8    itself to ensure -- and then we'll make sure that there are

9    the required two means of egress or escape routes and so

10   forth.

11        But this is a conversation between folks with a great

12   deal of technical knowledge.  And it ought to be a matter of

13   weeks until we're able to develop a plan that we believe is

14   satisfactory to the MSHA district manager.

15             THE COURT:  So this plan that you've submitted is

16   kind of in the working stages; it's not final or -- is this

17   something that you're working towards?

18             MR. BERMAN:  That's correct.

19             THE COURT:  And you need some more information in

20   order to kind of finalize it?

21             MR. BERMAN:  Correct.

22             THE COURT:  And you need assistance from the

23   plaintiffs to help in that regard?

24             MR. BERMAN:  Correct.

25             THE COURT:  Okay.

Bluestone v Pinnacle, et al.

```
1              MR. BERMAN:  Correct.

2              THE COURT:  Anything else?

3              MR. BERMAN:  I think, Your Honor, unless you have

4    additional questions, and I would like to reserve the

5    opportunity to respond, if necessary, but I've got nothing

6    further.

7              THE COURT:  All right.  Thank you, Mr. Berman.

8    Mr. Long, or, Mr. Nelson, what says the plaintiffs, because

9    in looking at this, and when I was reading over this plan,

10   to me, this appears to be the first time something

11   constructive had been offered.  And I know that you all have

12   rejected it, but I want you to address this from the

13   standpoint that the defendants are entitled to some way to

14   prepare their defense in this case, don't you think, in

15   terms of trying to get some idea what it's going to take to

16   show whether or not they were at fault causing this, all

17   this water damage, if you will.

18             MR. LONG:  I couldn't agree more, Your Honor.  And

19   that's why when the Fourth Circuit talked about this in

20   Belcher, they said, you know, go out and take some

21   depositions before you come running for inspection.

22        And they've not taken one deposition.

23        They act as if discovery just started.  We filed

24   extensive Rule 26(a)(1) disclosures in February of 2017.

25   And to give you further background, we filed, down in the
```

Bluestone v Pinnacle, et al.

1    Beckley Division, a complaint seeking injunctive relief in

2    2015, late spring of 2015, over this whole issue.  Pinnacle

3    was a party; they were aware of this.

4        They've had more than three years to come up with a

5    plan.  They could have proposed something in that

6    litigation, they could have filed a miscellaneous action,

7    they could have sought a temporary restraining order -- they

8    could have done a lot of things if they wanted to.

9        In fact, when they were drilling the borehole, when

10   they realized they were deviating from the plan and were

11   going to have real issues from the cement job going through

12   a mine, they might have said, wait, let's just take this

13   stuff out and run a cement bond log.

14           THE COURT:  What's that?

15           MR. LONG:  It's just -- you run an instrument down

16   and you check and see if there is a good cement bond, you

17   know, which goes around the metal casing.  But they could

18   still do that.  They could still drill a borehole down if

19   they want to look and test water like they talk about; they

20   could have for years.

21       They talk about no discovery done.  They have served

22   hundreds, and I mean hundreds of requests to produce,

23   hundreds of requests for admission.  By last count, over 400

24   interrogatories and still rising; yet, they've never taken a

25   deposition.  They have not even chose to depose former and

1   current Bluestone employees that were underground,

2   witnessing this massive flooding -- and we have video, but

3   unfortunately we didn't give you notice, about two

4   minutes -- it shows massive flooding.

5       It's not going through the coal barrier like he's

6   talking about; it's coming over top.  You take one look at

7   that, it's completely unsafe.  Okay.  Now, and I want to

8   bounce around a bit, because he did.  And I apologize.

9           THE COURT:  You don't have to apologize, Mr. Long.

10  There's a lot of stuff in this case.  And I'm sure you all

11  have been dealing with this for a while, just based on what

12  I've read the last couple days, there's a lot of material

13  there.

14          MR. LONG:  And they talk about 400 families.  What

15  about our families that can't work at this mine?  I find

16  that a little bit disingenuous, given that we have

17  information they're pulling their mine equipment out of

18  their mine now.

19          THE COURT:  How long has this mine been closed?

20          MR. LONG:  Since January of 2016; is that right?

21          MR. NELSON:  No.  We stopped production in '13.

22  Everybody was out in January '16.

23          MR. LONG:  Right.  So to give you some

24  background -- again, I'm going to jump a little bit.

25          THE COURT:  Sure.

Bluestone v Pinnacle, et al.

```
 1              MR. LONG:  When this all happened in the March of
 2     2015 time frame, Dave Altizer, who is the chief engineer for
 3     Bluestone Resources, parent of Bluestone Coal and
 4     Double-Bonus, was tasked by Tom Lusk -- and they're here
 5     today -- as the chief operating officer then, as the chief
 6     engineer, to go out and find a way for us to reopen this
 7     mine, you know, explore every opportunity.  And he did that.
 8          There is a series of memos.  We produced one, which was
 9     July 30, 2015, Mr. Altizer reached a conclusion:  "I've
10     looked at everything.  It can't be done safely."
11          He predicted what was going to happen would be, there
12     would be an influx of methane, like Sago methane.  Well,
13     guess what?  In January, 2016, it happened.
14          First cross-cut out away from the seals, the first main
15     seals, so it's the first cross-cut away from that, maybe 20
16     feet away, readings were taken of 2.4 percent methane.
17          That is a red flag.  That means places in that mine,
18     there is explosive concentration of methane, which means
19     between 5 and 15 percent.  You had to get from 15 percent,
20     which they conceded it was, behind the sealed area or more,
21     to 2.4 percent outby.  So there are explosive
22     concentrations.
23          Mr. Lusk, you know, would testify that his primary
24     responsibility as the chief operating officer is the safety
25     of the men and women working that mine.
```

Bluestone v Pinnacle, et al.

 1          He immediately said, "Pull the power and pull the men."

 2          They had every incentive to reopen this mine.  It's

 3     mind-boggling to me to suggest that somehow this is a

 4     litigation ploy to ruin a mine, roll the dice in litigation

 5     and try to recover.  When we have lost, by our own expert,

 6     Seth Schwartz [phonetic] in today's boom met market, by the

 7     time we go to trial, in profit over $60 million.

 8          Now, do you think we have every incentive to reopen

 9     this mine if we could?  And we would if it could be safely

10     done.

11          That's -- at the end of the day, it's about safety.

12          Okay.  Now, and I've just gotten to know Mr. Berman

13     over the last couple months, and I know he's a little bit

14     new, he expressed that, to the mine business, so to speak.

15     But the things he was pointing to, these pillars, they have

16     all been pulled.  You've heard of secondary mining,

17     pillaring.  They've pulled all those pillars.  You can't get

18     back in there.  It's rubble.  It's a void.  And that's what

19     they were putting borehole through, a void; not into

20     something solid, into a void.

21          And to, you know, digress a bit.  I'm amused that they

22     don't have a map.  But here we go, we got a map.

23          We produced hundreds of maps.  And MSHA has a certified

24     map on record and would not need another one.  And, oh, by

25     the way, they can submit a plan directly to Mr. Dotson if

1    they want.  They can submit a generic plan.

2            THE COURT:  They don't need you-all's approval or

3    cooperation?

4            MR. LONG:  They don't need us.  By the way, this

5    lateral cracking -- we're not claiming lateral cracking.

6        We are claiming they put -- basically put a lightning

7    rod through our mine.  They were supposed to put conductive

8    metal casing through our mine -- I mean, nonconductive.

9    They didn't.  They put conductive and they tried to paint it

10   in 25-degree weather.  So you've got methane we're talking

11   about with a lightning rod in one of our mine sections.  Not

12   to mention, we have a belt line that runs all the way down

13   the first mains that would be kind of conducive to

14   electrical strike.

15       And if you remember in Sago, the theory was there was

16   an old gas well about 150 feet away from the apex of the

17   explosion, and a lot of ground strikes and lightning that

18   night.  And the theory is that it went from that well bore

19   over to the mine and caused an explosion.  And that wasn't

20   the definitive cause, but that is a strong theory that's

21   what happened.

22       And this is -- I can't -- you know, I can't emphasize

23   this enough.  Understand, 2.4 percent methane, that is a big

24   deal in the mining industry.  They don't even care -- MSHA

25   doesn't even care if there is an ignition source.  Because

Bluestone v Pinnacle, et al.

```
1   we've learned from history in mining catastrophes, you
2   haven't thought of all of them.
3        So you have this concentration.  They don't need to
4   have an ignition source.  Once you're over 1 percent, you're
5   out.  Okay.
6        And at the time, we did that, which was the right
7   decision, the decision of the law we had to make.  We had a
8   fully operational ventilation plan, optimal conditions.
9   Natural courses, it was flowing 20 to 30,000 cubic feet per
10  minute, blowing across that face.
11            THE COURT:  And that was to remove the methane
12  gas?
13            MR. LONG:  Absolutely, yes.  You've heard of
14  blowing ventilation, just blow it right across the face.
15            THE COURT:  Well, let me ask you a question.  In
16  terms of this mine, was there a problem with methane gas and
17  water or just one?
18            MR. LONG:  Well, it's really in combination.  I
19  mean, because what happened -- another red herring I just
20  got to digress and deal with.  I keep seeing in pleadings
21  that we flooded our mine on purpose to create this
22  litigation bonanza; you know, it's a fraud and it's a sham,
23  it's -- whatever other language you can think of they put in
24  the pleadings directed to us.
25        It is sound engineering principles in the mining
```

```
 1   business for sealed-off sections, mined-out sections,

 2   secondary mine sections, if they are below elevation, in

 3   other words, what's left to be mined or inactive mines, if

 4   it's below that elevation, in other words, downhill, it's

 5   prudent to fill them with water, because it reduces the

 6   methane; you fill up the space.

 7            THE COURT:  So the drilling that they did, did

 8   that affect the methane, the water, or both?

 9            MR. LONG:  Well, it affected the water,

10   ultimately.

11            THE COURT:  Because the mine was flooded; is that

12   correct?

13            MR. LONG:  Well, it is now.  But what happened --

14   the plan was to flood, you know, first mains behind the

15   seals.  Over time, gradually, it was set up to handle

16   whatever we discharged out of that, pumped out of the mine

17   portal.  It was by plan.

18       It wasn't like some sinister, let's flood the mine.

19       That's what prudent people do.  And then the borehole

20   was drilled.  And about a year later, in probably one of the

21   highest elevations of the mine, now, second right, within a

22   matter of days , reacting to excessive storms on the

23   surface, is flooded.  It's pouring over the ceiling from

24   second right in front of the seals and first mains, and we

25   can't control it.  It's many --
```

```
 1              THE COURT:  So water is free-flowing?

 2              MR. LONG:  Free-flowing.  Again, if you see the

 3    video -- I'm really kind of surprised they even went

 4    underground to even be there for this.  It's coming through

 5    the roof bolts, and, you know --

 6              THE COURT:  Let me ask you this, Mr. Long.  In

 7    terms of trying to get to a position where there could be

 8    some type of inspection done of this mine, because based

 9    upon pleadings I read from the plaintiffs is that MSHA is

10    saying nothing can be done in terms of trying to have this

11    mine in a situation where they can do an inspection.

12         Is that correct or am I misstating that?

13              MR. LONG:  I think you're misstating.

14         MSHA has not said it can't be done, because they

15    haven't been asked --

16              THE COURT:  Well, your experts?

17              MR. LONG:  Yes.  Well, he's our expert, but he was

18    the chief engineer at the time.

19              THE COURT:  Of that mine?

20              MR. LONG:  Right.  All this was going on

21    pre-litigation now and these decisions were being made.

22    Think about that.  This is one of the best -- in our

23    lifetimes, this is one of the best met market ever.

24         We're operating other mines.  Why wouldn't we operate

25    this one?  Why wouldn't we want to spend the capital that
```

```
 1    they choose us not to be willing to spend if we thought it

 2    could be done?

 3           And you know why we don't do it?

 4           It's not safe.

 5           THE COURT:  Well, let me ask you this:  The

 6    Inspection Plan that they submitted, I understand they just

 7    submitted it I think on August 3rd, have you all reviewed it

 8    and rejected it, the entire plan?

 9           MR. LONG:  First of all, it's not a plan.  I mean,

10    for instance --

11           THE COURT:  It's not a plan?

12           MR. LONG:  No.  It's a theory.  It's a start,

13    maybe.  But we've reviewed it enough to know it's not

14    feasible and MSHA would never approve it.  Dave Altizer

15    issued a report, which we've provided, saying all the

16    reasons it's not.

17           THE COURT:  But up until that plan that was

18    submitted, they had not submitted anything else?

19           MR. LONG:  No.  They had submitted affidavits,

20    generically saying it could be done for five to eight

21    million dollars.

22           THE COURT:  And they wanted you all to pay for it?

23           MR. LONG:  Yeah.  From the very settlement, by the

24    way, that they challenged as not being in good faith because

25    it wasn't enough.
```

```
 1              THE COURT:  What, if anything, could be done to

 2     get a plan that's agreeable to both sides, if it can be

 3     done?  I'm just -- my whole purpose here is trying to see

 4     whether there can be something that would accomplish the

 5     goal of giving them the opportunity to do some inspection,

 6     and it would be agreeable to the plaintiffs to allow that to

 7     happen since it's your mine.  But I'm hearing mixed signals

 8     in that it would be too dangerous.

 9              MR. BERMAN:  May I address that?

10              MR. LONG:  If I could --

11              THE COURT:  Let's let Mr. Long finish.

12              MR. LONG:  If I could approach the Court with a

13     picture of the mine, Your Honor.

14              THE COURT:  Yes, sir.

15              MR. LONG:  I guess that would be Exhibit 1,

16     Plaintiffs', perhaps.  That's just to show you what --

17              THE COURT:  Yes, let's put a sticker on it.

18              MR. LONG:  That's the mine portal, Your Honor.

19     That's outside.

20              THE COURT:  I'll let her mark this first.  Go

21     ahead.  I'll just write on it.  It will be Plaintiffs'

22     Exhibit Number 1.

23              MR. LONG:  Thank you, Your Honor.

24              THE COURT:  All right.  Mr. Long.

25              MR. LONG:  Well, to answer your question, there is
```

Bluestone v Pinnacle, et al.

```
 1   no plan that we believe can be safely implemented.  They're
 2   talking about -- I mean, going back to my point where we had
 3   the ventilation system operating at its peak, before you had
 4   blackdamp and all this methane in the environment, before
 5   you had roof collapses and rib falls, because of flooding,
 6   their expert testified in unrelated litigation, but the same
 7   expert said, if you have all this water, it causes this
 8   pillar punching, which will severely damage the top; you
 9   can't do anything.
10        Well, we've had three years of flooding.  Now that the
11   shoe is kind of on the other foot, it's okay to go
12   underground.  But when we had optimum ventilation, we had to
13   abandon the mine.
14        Now they want to put a makeshift -- some type of plan
15   together to think it's going to be a better ventilation plan
16   than what was running.  Not to mention, think about what
17   they are talking about doing, just by the very nature, mine
18   rescue personnel?  Mine rescue apparatus for a civil
19   litigation?
20        These men -- he's a seven-time mine rescue champion,
21   Dave Altizer is four.  You know why they go underground?
22   You know.  They go underground to save people and recover
23   bodies.  They don't put themselves at harm's way to go
24   underground to go visualize something that MSHA personnel
25   have seen and our people have seen; yet, they've chosen not
```

Bluestone v Pinnacle, et al.

```
 1   to depose to get the information from them.  They could get

 2   all they need from them.

 3            THE COURT:  By way of a deposition?

 4            MR. LONG:  Deposition.  Just depose some people.

 5            Oh, by the way, Judge, we're talking a mile

 6   underground.

 7            THE COURT:  A mile?

 8            MR. LONG:  A mile.

 9            THE COURT:  All right.

10            MR. LONG:  If I could look at my notes real quick?

11            THE COURT:  All right.  Give him a second, Mr.

12   Berman.  Let him finish up.

13            MR. BERMAN:  Sure.

14            MR. LONG:  Just if I could, Judge Johnston denied

15   the Motion to Stay predicated on this.  And he basically

16   told defendants, you're lucky I'm giving you 60 days.

17        What they want to do, they can't get done even by the

18   close of discovery with this current schedule.

19            THE COURT:  Well, that is one of my concerns,

20   because as I read the pleadings, I read someone stated that

21   it may take, at least, up to -- at least six months.

22            MR. LONG:  Their chief engineer testified it would

23   take at least six months.  They talk about dewatering.  This

24   is way more than dewatering.

25        You're talking about methane gas now.  This isn't
```

1   simply dewatering a mine.

2          THE COURT:  Well, let me ask you this, Mr. Long,

3   is there any alternative to assist the defendants in

4   gathering some information that they could use in the

5   defense of this case in terms of any type of inspection that

6   can be conducted of this mine?

7          MR. LONG:  They could drill a borehole, if they

8   want to test water; they could do that.  They could actually

9   lift the pump out -- I mean, they could now because it

10  sounds like they've cut back, they're not producing anymore,

11  and go run a Smith bond log if they want to.  There are

12  things they can do.

13     And, again, I come back to depose people.  Most of them

14  work for us.  They may be even mad at us.  I think they've

15  talked to some of them.  Okay, find out what the situation

16  was like before, one, much less them, or us -- which I can't

17  fathom -- spend the money to do that when we think it can't

18  be done safely.  You're basically -- I can't imagine being

19  in your position, being asked to compel somebody, a company,

20  to do something that they fundamentally believe they can't

21  do because it's not safe.

22          THE COURT:  That's the issue, based on what I've

23  viewed, to require you all to do something that appears to

24  be unsafe.  And that's why I'm looking to see whether there

25  are any alternatives.

1              MR. LONG:  Well, I mentioned a couple.  I mean,

2      common sense, I mean, you -- we don't leave it at the front

3      door when we walk in the courthouse.  $60 million in profit,

4      you don't think we'd have rehabbed this mine and gone at it?

5      I mean, it defies common sense.

6              THE COURT:  Okay.  Anything else, Mr. Long?

7              MR. LONG:  By the way, it's not just one agency,

8      it's at least three or four that there has to be approval;

9      you've got DEP, you've got EPA, West Virginia All Surface

10     Mining, Health and Safety --

11             THE COURT:  So you have to have approval from all

12     these agencies?

13             MR. LONG:  There's water discharge issues and

14     everything else.

15             THE COURT:  So that would be MSHA, EPA -- and who

16     else?

17             MR. LONG:  Oh, I'm sorry.  EPA, DEP, MSHA, and

18     then the state equivalent, West Virginia Office of Miners'

19     Safety, Health, Miners' Training -- or something like that.

20             THE COURT:  So that's at least four different

21     agencies?

22             MR. LONG:  Couple of -- I'm sorry.  That's four, I

23     guess.

24             THE COURT:  All right.

25             MR. LONG:  Now, and I probably should have

1      mentioned this upfront.  You granted the motion to consider

2      some other stuff today.

3           THE COURT:  Right.  I granted both motions on both

4      sides, because it was helpful to the Court to try to get a

5      better feel for this.

6           MR. LONG:  But think about really why we're here.

7      It was a Motion to Compel, based on a Notice of Inspection

8      filed in March of this year, right, to which they said -- we

9      responded by e-mail two days later, and said, it's closed.

10     MSHA -- here's the pictures; you can't do this.

11          So it's not like we didn't get back to them right away.

12     And here we are now, you know, with the Motion to Compel

13     that existed then, it was a practical and legal

14     impossibility.

15          It was practically impossible to meet what they set as

16     their inspection deadline, because their own chief engineer

17     said it's going to take minimally six months, if you could

18     ever get approval, which we don't think you could.  That's

19     number one.

20          And number two, it's legally impossible, because they

21     knew we had to get MSHA approval.  We put them on notice;

22     they knew we were in temporary idle status.

23          They knew to do what they wanted to do, we'd have to

24     pump hundreds of millions of gallons of water.  And they set

25     it a month later and then filed a Motion to Compel on the

1    heels of that.  That's really why we're here.

2        But now at the eleventh hour they drop this -- I'm not

3    going to phrase it and call it a plan -- it's not.  It's not

4    signed, it's not sealed.  I'm told that you'd have to have a

5    minimum of 50 maps, minimally, to submit with this to show

6    MSHA what you're going to do.  You can't --

7        THE COURT:  Well, based on what you're saying,

8    MSHA may not approve this plan as it's written.  Is that

9    what you're saying, Mr. Long?

10       MR. LONG:  I think that's a very good possibility.

11       THE COURT:  Okay.

12       MR. LONG:  But to get to that point -- first of

13   all, to get to that point, six months, maybe a year, a lot

14   of money being spent.  And then say we get to that point --

15   say they said that we're not really worried about methane,

16   we think it can be controlled better with this makeshift

17   plan versus the way you were doing under normal

18   circumstances.  What do we know we're going to get, you

19   know?

20       THE COURT:  All right.  Anything else, Mr. Long?

21       MR. LONG:  Not at this point.

22       THE COURT:  All right.  Mr. Berman, I'll give you

23   the last word.

24       MR. BERMAN:  Thank you, Judge.  We talked about --

25   Mr. Long has talked about common sense.  If all of this is

Bluestone v Pinnacle, et al.

```
 1    right, if everything Mr. Long is saying is correct:  This is

 2    too dangerous, there is methane, it can't be done --

 3              THE COURT:  But you agree that methane would be

 4    something that you need to be aware of because that presents

 5    a dangerous situation?

 6              MR. BERMAN:  Absolutely.  And our experts have

 7    looked at this carefully and said this can be properly

 8    ventilated.  Absolutely.  But if everything Mr. Long is

 9    saying is true, that it can't be done, and that with an

10    extremely dangerous and combustible situation, it can't be

11    remediated or addressed through the use of appropriate

12    technology, MSHA will make that decision and tell us to go

13    pound sand.

14              THE COURT:  Can it be done in less than six

15    months?

16              MR. BERMAN:  We believe it can, on one condition,

17    which is that Bluestone has to provide us with some of the

18    information we need.  Now, there are a couple of things that

19    Mr. Long said, respectfully, that are not correct, and I'll

20    address those in a minute.  Like, for instance, most

21    importantly, that we can go to MSHA without Bluestone,

22    without the operator of the mine.

23         We can't do that.  That's what I'm told by my experts

24    definitively.

25         But it's a funny thing, right, Bluestone is saying, you
```

1    guys destroyed our mine, you flooded our mine, and you

2    caused us $600 million in damage.

3         And we said, great, let's see it.

4         And they said, can't be done.

5         Says, who?

6         Well, says them.

7         They are saying it's too dangerous.

8         MSHA is not saying that.

9         This is a decision -- and we're really not asking for

10   that much.  We're asking for the right to take this request

11   to the agency that has specialized expertise.  I mean, mines

12   always have problems.

13        THE COURT:  What about those agencies, Mr. Long

14   indicated there were at least four agencies you'd have to

15   get approval from?

16        MR. BERMAN:  My understanding -- and if the Court

17   will indulge me for a second, I just want to confer with my

18   expert.  My understanding is that the difficult approval to

19   get, the one that will require work and negotiation will be

20   from MSHA.

21        THE COURT:  So you have to start with MSHA and

22   work your way down?

23        MR. BERMAN:  And once we get MSHA approval, we're

24   really there.  But let me just double-check that to make

25   sure I haven't misrepresented anything to the Court.

Bluestone v Pinnacle, et al.

```
1              THE COURT:  Sure.

2         (Pause.)

3         (An off-the-record discussion was held between Attorney

4    Berman and an expert.)

5              THE COURT:  Yes, sir.

6              MR. BERMAN:  Thank you, Your Honor.

7         What I represented to the Court is in sum and substance

8    correct.  MSHA is going to be the tough one.  In fact, we

9    understand as far as the DEP goes, that Bluestone may

10   already have certain relevant permits in place.

11        I want to leave something -- I want to leave no doubt

12   in Your Honor's mind about something.  We will pay for this,

13   however much money this requires.  Mr. Brent Mickum is in

14   the room, general counsel, and in power to speak on behalf

15   of the company.  We will pay for this.

16             THE COURT:  For the inspection?

17             MR. BERMAN:  For the inspection.  All of the costs

18   associated with getting adequate ventilation, with ensuring

19   they wear those little methane meters, and ensure that the

20   concentration of methane is safe.  And I respect the mine

21   rescue team of Bluestone.  We are not asking them to do

22   anything.

23        We are going to use our mine rescue team to go in.  So

24   let there be no doubt about that.  We will pay.  We will use

25   our mine rescue experts.
```

1          But the big thing that sticks in my mind is if this

2     were all true, it just couldn't be done, if it were

3     impossible, why is Bluestone fighting tooth-and-nail to

4     prevent us from even asking MSHA.

5          I would respectfully submit that the answer is, because

6     it's not that hard, because we will get approval from MSHA.

7     And once that happens, the jig is up.  Because we have

8     information -- may I approach again?

9                THE COURT:  Yes, sir.

10               MR. BERMAN:  We have information -- and I don't

11    know that it will be helpful to the Court to detail -- but

12    from eyewitnesses.  First of all, Bluestone stopped mining

13    in 2012 or 2013, I can't remember.

14         This is the lowest elevation point of the mine

15    (indicating).

16         We have information, reliable information from

17    eyewitnesses that Bluestone shut off its own deepwater pumps

18    that were responsible for pumping -- let this number sink

19    in -- 500 gallons of water per minute.  They shut them off

20    years before Pinnacle drilled its borehole, which means that

21    everyone at Bluestone, the folks we've spoken to, knew it

22    was simply a matter of time before this was going to flood

23    and fill up.

24               THE COURT:  So the Pinnacle mine -- if I'm reading

25    this correctly, the Pinnacle mine is close to the Bluestone

1    mine?

2              MR. BERMAN:  The Pinnacle mine is beneath the

3    Bluestone mine.

4              THE COURT:  Beneath the Bluestone mine.

5              MR. BERMAN:  That's right.  Now, the fact that the

6    pillars in the sealed district have been taken out and

7    there's been a settling or a collapse, completely

8    irrelevant.  We're not going in there.

9         We'd like to go under this portion of the mine and

10   inspect the integrity of the barrier (indicating).

11        And so, the other thing is, Mr. Mickum, our D.C.

12   suggested something right now.

13             THE COURT:  Mr. who?

14             MR. BERMAN:  Mr. Mickum, who is the general

15   counsel of my client.

16             THE COURT:  Can you spell that, if you know, for

17   the court reporter.

18             MR. BERMAN:  Yes, sir.  It's, M-I-C-K-U-M.

19             THE COURT:  All right.  Thank you.

20             MR. BERMAN:  Another creative solution -- so,

21   again, we want to the right to go to MSHA and let them

22   decide.  We will pay and we'll use our mine rescue

23   personnel.  But if the Court has concerns, this is kind of a

24   great candidate for a special master to report to Your

25   Honor, as we -- you know, the order to compel could be

1    limited, it could require the parties to work together to

2    submit the plan to MSHA.

3         And then if the special master, who would be

4    representing Your Honor, has any concern that there is sort

5    of mucking around or either that we are not cooperating

6    properly or that we have, you know, embarked on a fool's

7    errand, that special master can report back to the Court.

8    That would be one solution that -- Your Honor asked for some

9    creative solutions.

10        The other thing is that we don't think for the reasons

11   that I explained to you having to do with the water traps,

12   we may not need to go all the way in.  It may suffice for

13   our purposes to get past this area of traps (indicating),

14   and see that water is still pouring out.  Because if water

15   is still pouring out, that means this is still full

16   (indicating), and we didn't cause the flooding by putting

17   the borehole through there.

18             THE COURT:  But that's the kind of information you

19   need, though, right?

20             MR. BERMAN:  That's exactly right.  That's what we

21   got to understand.

22             THE COURT:  If it's there.

23             MR. BERMAN:  If it's there.  And if MSHA says to

24   my clients' experts, "You are out of your mind," then we

25   will not get the right to do this, and we will proceed to

Bluestone v Pinnacle, et al.

```
1    trial and do the best we can to defend ourselves without

2    this evidence.

3         One final word, Your Honor, which is, we certainly have

4    served requests for the production of documents.  They have

5    served requests for the production of documents.  We will be

6    taking depositions; they will be taking depositions.

7    Nothing --

8              THE COURT:  Your request for production of

9    documents, is that the one that was just filed on August

10   9th?

11             MR. BERMAN:  There were various requests for the

12   production of documents, going back to the end of 2017.

13             THE COURT:  Okay.  But you filed a new one on

14   August 9th, ECF No. 208; is that correct?

15             MR. BERMAN:  Oh, that's a Motion to Compel the

16   production of additional materials.  We have -- and I don't

17   want to stray too far afield, but we understand that all of

18   the Bluestone executive team have laptops and correspond

19   regularly by e-mails, and I think if -- Ron, correct me if

20   I'm wrong -- to date, we received something in the order of

21   25 e-mails, which suggests to us that the production is

22   radically incomplete, and we don't want to proceed to all of

23   the depositions without the materials.

24             THE COURT:  Well, this request was only filed on

25   August 9th, so the plaintiffs need an opportunity to
```

1    respond.  So --

2              MR. GORSICH:  If I may, Your Honor?  Ron Gorsich

3    on behalf the defendants.  That was a Motion to Compel

4    production.  It's about requests that have been sent months

5    back.  They've had ample opportunity to respond.  We've met

6    and conferred; had the opportunity to supplement their

7    discovery.  Now this is a Motion to Compel, because we

8    believe they haven't produced everything that they should.

9              THE COURT:  Well, all I'm saying is that this was

10   just filed on the 9th, so they have a right to respond

11   before I rule on it.

12             MR. GORSICH:  Oh, absolutely.

13             MR. BERMAN:  Correct.  And I'm not trying to say

14   that it's before the Court today.  It's certainly not.

15   The only relief we are seeking is an order from Your Honor

16   allowing us to take -- they said it can't be done; we say it

17   can be done.  We would respectfully request that we be

18   allowed to take that to the expert.

19             THE COURT:  Well, what I want to do is to have the

20   parties meet and confer to see if something can be done in

21   order to do this inspection.  I would ask that you all do

22   that in a short time frame, what, 10 days?

23             MR. BERMAN:  That would be sufficient.

24             THE COURT:  Mr. Long, is that sufficient?

25             MR. LONG:  Whatever the Court orders, but I would

1    like to respond to some of the new things he brought up, if

2    I could.

3           THE COURT:  Yes, sir.

4           MR. LONG:  First of all, this is nothing but

5    another attempt for massive delay of this trial.  This is an

6    end run, in my view, on Judge Johnston's recent

7    consideration of the motion to continue.  I mean, it's

8    nothing but that.  They've had years to do this.  If you're

9    at all inclined to do it, I mean, which -- again, given the

10   safety considerations, I would at least say, take some

11   depositions, prove to me you can't get what you say you

12   need.

13          THE COURT:  Well, I can't make them take

14   depositions, Mr. Long.

15          MR. LONG:  Yes, but you can refuse their Motion to

16   Compel on the basis -- like the Fourth Circuit did in

17   *Belcher*.

18          THE COURT:  Well, what I would like to do is give

19   you all 10 days, since they have since presented some type

20   of plan, I'll give you 10 days to see whether this can be

21   done, that's agreeable to both sides, then to advise the

22   Court the results of that meeting and conferring.  And then

23   if nothing has been accomplished, then the Court will issue

24   a ruling.

25          MR. LONG:  All right, Your Honor.  We would, at

Bluestone v Pinnacle, et al.

```
 1    least -- if he's here today, is their expert going to verify
 2    this plan?  I mean, what are we supposed to review?  We've
 3    reviewed some unverified, unsigned, anonymous plan.
 4              THE COURT:  Mr. Berman.
 5              MR. BERMAN:  I hope this is something we can work
 6    out in the next 10 days.
 7              MR. LONG:  Well, we're here.
 8              MR. BERMAN:  We ought to be able to get and still
 9    haven't gotten a certified mine map from Bluestone.
10              MR. LONG:  They're at MSHA.  MSHA doesn't need a
11    certified map.
12              THE COURT:  Well, argue to me.  Don't argue to
13    each other.
14              MR. BERMAN:  Yes, I stopped myself.  The plaintiff
15    is in possession of that proper request in discovery and
16    they've been withholding that.
17              THE COURT:  Well, when you all meet and confer,
18    you all can discuss that, whether that's available, the map
19    is available.
20              MR. BERMAN:  Judge, I would ask -- and I think Mr.
21    Long may be in agreement -- I may be actually predicting
22    what my colleague is going to say -- but in connection with
23    this order that we meet and confer, would you also order
24    that the expert be present, because I think that would be
25    very helpful.
```

Bluestone v Pinnacle, et al.

```
 1              MR. LONG:  Can I make a point there?

 2              THE COURT:  Yes, sir.

 3              MR. LONG:  We make the point in our response, they

 4   didn't meet and confer with us.  We could have done this in

 5   May.  We brought Dave Altizer.  Now they want to meet and

 6   confer, you know, follow the rules.

 7              THE COURT:  Well, this is one last chance.

 8              MR. BERMAN:  Thank you, Your Honor.

 9              MR. LONG:  I would ask -- first of all, we go

10   right back to we deliberately shut -- yeah, we shut those

11   pumps off on purpose.  He talks about it.  That was designed

12   to fill up first mains.  We shut -- we pulled them.  It's

13   not nefarious; it's a plan.

14              MR. BERMAN:  But it's still --

15              THE COURT:  Let him finish.

16              MR. LONG:  We did fill the mine by design --

17              THE COURT:  Argue to me, Mr. Long.

18              MR. LONG:  Now, if they are going to do all --

19   they are going to pay the costs, I assume.

20              THE COURT:  They said they're going to pay the

21   cost for the inspection and they will use their mine rescue

22   team if necessary.

23              MR. LONG:  Think about that.  They are going to

24   use a mine rescue team for a civil lawsuit inspection?  Be

25   that as it may.
```

```
1          Are they going to post a bond?

2          We would request a significant bond.  We'd like to be

3    able to brief that issue.  If they are going to go around

4    messing around our mine, could destroy things, could kill

5    somebody, we'd like a bond, and probably some type of

6    indemnity agreement and a lot of other things.

7               THE COURT:  That's something you all need to

8    discuss, if you all -- if that's something that can be

9    worked out.  If not, then I think you ought to come back to

10   the Court.

11              MR. BERMAN:  MSHA will impose that restriction,

12   so Your Honor knows.  If Mr. Dotson or one of the district,

13   assistant district managers deems this to be very

14   dangerous -- or they will often say, you're going to have to

15   post a bond.

16         So if that's the order from MSHA, we'll comply with it.

17         May I address one final point, Judge, just as it

18   relates to Judge Johnston?  And, certainly, I would urge

19   Your Honor to talk to him.

20              THE COURT:  I will.  I plan to confer with him.

21              MR. BERMAN:  But this is not an end run.  What I

22   asked for directly is, Judge, doesn't it make sense for you

23   to look at the Motion to Compel , too?  Because if that's

24   granted, it would necessarily move the trial back from

25   January to maybe, you know, could be April, May.  I don't
```

Bluestone v Pinnacle, et al.

1    want to predict.

2         But he said, I'm going to leave that decision to Judge

3    Tinsley, and if that has an effect on the scheduling, it has

4    an effect on the scheduling.  But we're not talking about

5    years.

6              THE COURT:  Well, right now the trial is scheduled

7    for -- or was, November 13th, 2018.  That has been moved now

8    to January?

9              MR. BERMAN:  Yes, sir.

10             THE COURT:  Okay.

11             MR. BERMAN:  But Judge Johnston is keenly aware, I

12   think, that we're here today and the motion is pending

13   before Your Honor, and that, if granted, it -- it certainly

14   could affect the trial date.  We may be able to get this

15   done very quickly.  But if we can't, he is absolutely --

16   there is -- I simply take issue with the notion that this is

17   an end run around his order.  It's not.  It's all

18   aboveboard.

19             THE COURT:  All right.  Well, today is August 10th

20   [sic], I'm going to give you all till next Friday, which is

21   the 24th, to meet and confer and then report back to the

22   Court whether there has been any progress in working out

23   something to be done.  And, if not, then the Court will make

24   a ruling accordingly.

25             MR. LONG:  Can we ask the Court to determine or

```
 1    direct that they submit a verified, signed plan before we

 2    meet and confer?

 3              THE COURT:  Can you do that, Mr. Berman?

 4              MR. BERMAN:  We don't have the documents --

 5              THE COURT:  You don't have the map?

 6              MR. BERMAN:  -- necessary.

 7         Mr. Meadows, do you want to address why that's

 8    impossible for us at the moment?

 9              MR. MEADOWS:  Are you talking about with respect

10    to the documents or the map?

11              MR. BERMAN:  With respect to our submitting a

12    certified map as Mr. Long is requesting.

13              MR. LONG:  I'm just asking --

14              MR. BERMAN:  A certified plan.

15              THE COURT:  Wait a minute.  Mr. Long wants a

16    certified plan that has been signed by someone from your

17    side.

18              MR. BERMAN:  So, Mr. Hartsog simply doesn't

19    understand what's being asked for.

20              MR. LONG:  I'm asking he signs and certifies his

21    report, if that's his report.

22              THE COURT:  Very simple.

23         Well, you have time to work with him and see if he can

24    sign something and submit it or be used when you meet and

25    confer.
```

1          MR. BERMAN:  Yes.

2          THE COURT:  So I'm going to order that when you

3    meet and confer, that you present a signed inspection plan

4    that can be considered by counsel for the plaintiffs so that

5    you all can use that as a starting point to work out some

6    type of --

7          MR. BERMAN:  I'm seeing nods from the gallery.

8          MR. LONG:  Can I ask just a matter of

9    clarification?  I mean, is this his plan?  Can I ask that?

10   Is this Mr. Hartsog's plan?

11         THE COURT:  Well, I'm got not going to get into

12   that right now.  He's going to submit to you a plan that's

13   going to be signed, and it may be that one or it may be

14   something entirely different, but it's going to be signed.

15         MR. BERMAN:  Understood.  And for clarification --

16   I believe Mr. Long knows this -- the plan that is first

17   submitted to MSHA and the plan that is ultimately agreed

18   upon by MSHA goes through iterations.

19         THE COURT:  It goes through what?

20         MR. BERMAN:  It goes through changes, just

21   necessarily.

22         THE COURT:  What do you mean by that?

23         MR. BERMAN:  Meaning, we would submit a proposed

24   plan to the district manager.  And the district manager

25   might say , okay, I think I'd like to see additional fans,

Bluestone v Pinnacle, et al.

 1    for instance, in this location, or certain additional

 2    precautions.

 3        And you'd say, okay, we'll be back to you in a week and

 4    try with a slight revision to the proposal.

 5        Then you come back in a week and you say, okay, we

 6    proposed to put a plan here and here -- a fan, excuse me.

 7        And Mr. Dotson might say, okay, but I've got another

 8    question about the safety of the roof in this given spot.

 9        So it can go through some -- but that doesn't have to

10    be a protracted process.

11            MR. LONG:  What it means, Your Honor, is it going

12    to take him six months or more that --

13            MR. BERMAN:  Well, what I mean is it could take up

14    to a month.

15            THE COURT:  Well, that's what I'm getting to.  You

16    all have to get back to the Court by the 24th that you all

17    have a plan, if it works.  You may not be able to get one.

18    But if you all get a plan that you all agree to, then that

19    has to be submitted to MSHA.  And then I need to know

20    whether you all agree on the plan that you're going to

21    submit.

22            MR. BERMAN:  Yes.  I think the way it might work

23    in practice, Judge, is that we would say something like, we

24    need X, Y, and Z information, and we need to know that you

25    will at least take no -- you, Bluestone, at least take no

1    position.  In other words, as I said before, if we are --
2    show a plan.  They say, look, go ahead.  We don't think it's
3    going to get approved, but go ahead and submit it.  Then we
4    need to know, at a minimum --
5            THE COURT:  Who will say that?  Because you're
6    submitting the plan to MSHA, right?
7            MR. BERMAN:  Well, the idea, as I understand what
8    Your Honor is ordering, for us to work together --
9            THE COURT:  For you all to work together to get a
10   plan, a joint plan.
11           MR. BERMAN:  Right.  That's right.
12           THE COURT:  And then you submit that joint plan to
13   MSHA --
14           MR. BERMAN:  Got it.  That's great.
15           THE COURT:  -- for approval.
16           MR. BERMAN:  It only works, though, if the
17   plaintiffs, if my adversaries are willing to give us some of
18   the additional information we need, and if they are willing
19   to say, okay, we actually don't think it's going to get
20   granted, but we are not going to undermine it -- no pun
21   intended -- by calling up the ADM and saying, hey, don't
22   grant this or by otherwise --
23           THE COURT:  I don't think they'd do that, Mr.
24   Berman.
25           MR. BERMAN:  All right.

Bluestone v Pinnacle, et al.

```
1              MR. LONG:  We reserve the right not to agree to

2       any plan if we don't believe it's safe.

3              THE COURT:  Right.  That's our plan.

4              MR. LONG:  I can predict for you now, it's going

5       to be a massive request for information, in light of all

6       we've produced.  But I'm just here to tell you that that's

7       what is going to happen.

8              THE COURT:  I want you all to try.  And then, like

9       I said, I need to know what happens by the 24th, and then

10      we'll go from there.

11             MR. LONG:  And two other points.  I've been

12      assured by the senior vice president of safety, a plan -- a

13      generic plan can be submitted on their own to MSHA, asking

14      whether the parameters are appropriate.  Okay.  They can go

15      that route on their own.

16         And another thing that they're neglecting, this is

17      going to have to go and have input from technical support

18      people in Arlington, Virginia.  It's not just going to be

19      calling up Mr. Dotson, saying, this is good.  It's going to

20      go to Virginia.

21             THE COURT:  Well, just get it together and advise

22      the Court by the 24th.

23             MR. BERMAN:  I understand, Your Honor.

24             THE COURT:  And then I may see you all again.  I

25      hope not, but I may see you all again.
```

Bluestone v Pinnacle, et al.

```
 1        All right?
 2              MR. BERMAN:  Thank you, Your Honor.
 3              THE COURT:  Is there anything further?
 4              MR. BERMAN:  No, sir.
 5              MR. LONG:  Thank you, Your Honor.
 6              THE COURT:  If there is nothing further, we are
 7     adjourned.  Thank you.
 8              THE CLERK:  All rise.  This Court is in recess.
 9     (Proceedings concluded at 2:50 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1              CERTIFICATE OF OFFICIAL REPORTER

 2        I, Catherine Schutte-Stant, Federal Official Realtime

 3   Court Reporter, in and for the United States District Court

 4   for the Southern District of West Virginia, do hereby

 5   certify that, pursuant to Section 753, Title 28, United

 6   States Code, the foregoing is a true and correct transcript

 7   of the stenographically reported proceedings held in the

 8   above-entitled matter and that the transcript page format is

 9   in conformance with the regulations of the Judicial

10   Conference of the United States.

11

12        s/Catherine Schutte-Stant, RDR, CRR

13        _____ August 19, 2018

14        Catherine Schutte-Stant, RDR, CRR
          Federal Official Court Reporter
15

16

17

18

19

20

21

22

23

24

25
```