```
            IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                      AT CHARLESTON


_____x
                                :
BLUESTONE COAL CORP., et al.,   :      Civil Action
                                :
              Plaintiff,        :      No.  2:16-cv-06098
                                :
v.                              :
                                :      Date: July 20, 2018
PINNACLE MINING COMPANY, LLC,   :
                                :
              Defendant.        :
_____x


       TRANSCRIPT OF TELEPHONIC STATUS CONFERENCE HELD
     BEFORE THE HONORABLE THOMAS E. JOHNSTON, CHIEF JUDGE
              UNITED STATES DISTRICT COURT
               IN CHARLESTON, WEST VIRGINIA

APPEARANCES:
(All telephonically)


For the Plaintiffs:        DAVID F. NELSON, ESQ.
                           R. SCOTT LONG, ESQ.
                           Hendrickson & Long
                           P. O. Box 11070
                           Charleston, WV 25339


For the Defendants:        JOSHUA A. BERMAN, ESQ.
                           White & Case
                           1221 Avenue of the Americas
                           New York, NY 10020-1095

                           MARK E. GUSTAFSON, ESQ.
                           White & Case
                           Suite 2700
                           555 South Flower Street
                           Los Angeles, CA 90071

                           PETER J. RAUPP, ESQ.
                           JOHN JOSEPH MEADOWS, ESQ.
                           Steptoe & Johnson
                           P. O. Box 1588
                           Charleston, WV 25326-1588
```

*Ayme A. Cochran, RMR, CRR (304) 347-3128*

(Appearances continued)

```
                              DENNIS R. ROSE, ESQ.
                              Hahn Loeser & Parks
                              Suite 2800
                              200 Public Square
                              Cleveland, OH 44114

                              THOMAS M. HANCOCK, ESQ.
                              Bowles Rice
                              P. O. Box 1386
                              Charleston, WV 25325-1386

                              JOHN L. MACCORKLE, ESQ.
                              MacCorkle Lavender
                              P. O. Box 3283
                              Charleston, WV 25332


In-House Counsel:             GEORGE B. MICKUM
                              ASTRIKA ADAMS
                              GARY BROADBENT



Court Reporter:               Ayme Cochran, RMR, CRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.
```

1          PROCEEDINGS had before The Honorable Thomas E.

2    Johnston, Chief Judge, United States District Court,

3    Southern District of West Virginia, in Charleston, West

4    Virginia, on July 20, 2018, at 2:00 p.m., as follows:

5          COURTROOM DEPUTY CLERK:  Hi.  It's Staci in Judge

6    Johnston's chambers.  Who do I have on the line for the

7    plaintiff?

8              MR. LONG:  Scott Long.

9          (Telephonic interruption)

10             COURTROOM DEPUTY CLERK:  And how about for --

11             MR. MICKUM:  Brent Mickum here for Pinnacle.

12             MR. BERMAN:  Hi.  This is Josh Berman from White &

13   Case for Pinnacle and Seneca.

14         (Telephonic interruption)

15             MR. BROADBENT:  This is Gary Broadbent for

16   Pinnacle and Seneca.

17             MR. MEADOWS:  Hi, Staci.  This is John Meadows and

18   Peter Raupp for Pinnacle and Seneca.

19             MR. GUSTAFSON:  Good afternoon.  This is Mark

20   Gustafson of White & Case, also for Pinnacle and Seneca.

21             MR. MACCORKLE:  This is John MacCorkle for Ken &

22   Coy Rock.

23             MR. HANCOCK:  Staci, Tom Hancock for Cliffs

24   Natural Resources.

25             COURTROOM DEPUTY CLERK:  Anybody else?

1          MS. ADAMS:  This is Astrika Adams for Pinnacle

2    Mining and Seneca Coal Resources.

3          COURTROOM DEPUTY CLERK:  Okay.

4          MR. NELSON:  Dave Nelson for the plaintiffs.

5          MR. ROSE:  Dennis Rose for Cliffs.

6          COURTROOM DEPUTY CLERK:  Anybody else?  Hearing

7    none, I'm going to quickly get the judge before anybody

8    changes their mind.  Hold on.

9       (Pause)

10          THE COURT:  Good afternoon.  This is Judge

11   Johnston.  This is a telephonic hearing in Bluestone v.

12   Pinnacle and others, civil action number number 2:15-cv-

13   06098.

14      I have in my chambers my law clerk, Hunter Yoches; my

15   courtroom deputy, Staci Wilson; and my court reporter, Ayme

16   Cochran.

17      I am not going to have everyone note their appearances

18   because there are quite a few of you and Ayme was here for

19   the roll call that Staci did of counsel on the call.

20      I am going to ask you a couple of things up front.

21   First of all, if you're not speaking, please put your phone

22   on mute so that we don't hear you tapping keyboards,

23   breathing, or walking around.

24      Secondly, when you speak, please identify yourself so

25   that we have a clear record.  There's a lot of you and we

```
 1    want to make sure we get -- more specifically, my court
 2    reporter, Ms. Cochran, wants to make sure everything is
 3    correct.
 4         Finally, I'm going to offer a warning to Mr. Meadows,
 5    but it applies to everybody.
 6         Mr. Meadows, you have a tendency to speak very quickly
 7    and I don't want to have to unleash the wrath of my court
 8    reporter on you.  So, I'm going to tell you up front, I want
 9    you to speak slowly today and, if you're not, you're going
10    to hear about it, but that goes for everyone else, too.
11              MR. MEADOWS:  I'm going to try not to talk at all
12    today, but if I do, I promise Ayme will hear every word I
13    say.
14              THE COURT:  Well, good.  Ayme has a big smile on
15    her face right now.
16         So, anyway, so we're here on these motions.  First of
17    all, there was a -- there was a motion to strike that has
18    been -- there was a motion to withdraw that, so the motion
19    to withdraw will be granted, which I think leaves us with a
20    motion by Cliffs to continue the scheduling order.  Who
21    wants to address that first?
22              MR. HANCOCK:  Your Honor, Tom Hancock with Nelson
23    Mullins.  If it pleases the Court, I will be happy to
24    address that motion, and I'm going to try to be as brief as
25    possible on this.  The point is, there's no realistic way
```

1    that this case is going to be ready to try on November 13th,

2    2018, and I don't think that there's going to be much

3    disagreement about that on the phone call today, at least

4    any disagreement with any reasonable basis, because there's

5    simply no way that it's going to be ready in November to try

6    and I know for a fact that Pinnacle and Seneca agree with

7    us.  And they have filed another motion suggesting the same

8    thing.

9         And we would ask Your Honor for a 90-day extension.  I

10    think Pinnacle asked for 120 days and, frankly, Your Honor,

11    that's probably overly optimistic with what we have left to

12    do in the discovery in this case and I'm going to again try

13    to be brief.

14         We've got about 20 facts witnesses that we still need

15    to take their depositions.  There's a significant amount of

16    written discovery that's still flying around.  There's some

17    disputes regarding that that are brewing that we hope to be

18    able to resolve without coming back to the Court but,

19    certainly, that's going to take time.

20         You know, this is a case where the plaintiffs have said

21    that they issued company laptops and, yet, we've only had 25

22    e-mails produced.  And so, there's a significant amount of

23    work to be done in terms of written discovery.

24         In addition to that, the scheduling issues with all of

25    these depositions are significant in a case like this with

1    so very many lawyers and so very many law firms.

2         And then, on top of all that, we've got expert

3    discovery to do.  There are twelve experts, I think, in the

4    case that have been disclosed right now and we have yet to

5    do rebuttal experts.  So, the idea that we would be ready to

6    do this by November 13th, I think, is completely and totally

7    unrealistic.

8         And, in fact, like I said before, even with a

9    four-month extension, that's probably being overly

10   optimistic and it may need to be longer.  We may need to

11   come back and ask Your Honor for another extension, even

12   after -- in addition to that.

13        So, on top of all those things, there's also the

14   outstanding need for an inspection.  There's a motion to

15   compel the inspection of the mine that was referred to

16   Magistrate Judge Tinsley and I think that that was filed by

17   Pinnacle and they may want to address how all that plays

18   into this.

19             THE COURT:  Well, before we go on to that, I want

20   to ask you, this case has been pending for two years.  Why

21   am I hearing you, at this point, whining around about how

22   you can't get depositions done and can't get an inspection

23   done, which this case has been pending for two years.  Why

24   haven't you done that already?

25             MR. HANCOCK:  Well, Your Honor, we've been doing

1    those things.  You know, the written discovery is -- has

2    been going back and forth.  Some of these depositions that

3    we're trying to get scheduled now were actually noticed back

4    in December and got delayed for a number of different

5    reasons that weren't really the fault of any of the parties.

6         We also -- jointly, plaintiffs and all of the

7    defendants agreed that it made sense to go forward with the

8    mediation and, of course, in a case like this, it's not just

9    write a mediation statement and show up.  As Your Honor

10   knows, you know, there's significant insurance issues that

11   had to be worked out and so that took a significant amount

12   of time.

13        You know, on top of that, we've dealt with some of the

14   other co-defendants settling out and then, on behalf of

15   Cliffs, we're sort of an ancillary defendant anyway and so,

16   we're along for the ride in many respects but, you know, I

17   certainly don't think that we've been sitting on our hands

18   in this case and that was addressed in a lot of the briefing

19   that we did on this motion.

20             THE COURT:  Yeah.  Well, I'm sorry, but after two

21   years, I -- I'm having -- I'm having trouble being very

22   sympathetic to all that.  I don't care how big the case is.

23        And I will tell you all, at this point, I'm going to be

24   very focused on getting this case resolved.  Whatever

25   happens today, I am going to be very focused on getting this

1    case resolved and I'm going to have no patience for the kind

2    of foot-dragging that's already taken place in this case.

3         Let's hear from Pinnacle.

4              MR. BERMAN:  Thank you, Your Honor.  Nice to meet

5    you.  This is Josh Berman from White & Case on behalf of

6    Pinnacle.  I won't repeat everything that's been said.  And

7    I understand the directive that Your Honor just gave and we

8    can move things along very quickly and we will heed that

9    directive carefully.

10        I want to bring a couple of additional points to Your

11   Honor's attention.  The first is that the -- the motion to

12   compel, which was filed in March -- so approximately three

13   months ago -- is pending before Judge Tinsley and, if that

14   motion is granted, it will change really the complexion of

15   the trial in the entirety and, respectfully, we think that

16   having an opportunity to de-water the mine and for experts

17   to actually inspect the physical asset that we are -- we,

18   Pinnacle, are accused of destroying is a matter of basic

19   fundamental fairness.  And we are advised by expert after

20   expert that de-watering the mine for purposes of having an

21   expert conduct a physical inspection of the premises is an

22   entirely routine matter.

23        You may have seen in various submissions made by

24   plaintiffs' counsel that they think our plan to de-water the

25   mine, to dig out the mine, is Pollyanish and it's naive, but

1    the fact of the matter is, the plaintiffs have refused to

2    join Pinnacle and to join with any of the defendants in even

3    getting the application to MSHA itself and, at a minimum,

4    Pinnacle would submit to the Court that it's a matter of

5    basic fairness to compel Bluestone to join us, the

6    defendants, they are accusing of this enormous wrongdoing or

7    allegedly valuable wrongdoing in gathering the information

8    necessary to put forth an application.

9         And MSHA, who are really the subject matter experts,

10   will either permit the parties to de-water the mine and pump

11   out water and get the experts in there to have a look, or

12   they'll deny that application.  But, respectfully, that's

13   not an application we think that ought to be made by the

14   Court, the basis of their expert saying it can't be done and

15   our experts saying, of course, it can be done.

16        What we are asking for is just the right to take the

17   question to MSHA and, assuming our experts are not just

18   feeding us what we want to hear, we will -- we would like to

19   have them actually look at the mine.

20        And, you know, there's a very simple point here that

21   our experts are looking at driving at, which is an area, the

22   physical area in which Pinnacle drilled this borehole is

23   separated from the flooded area of Bluestone's mine by a

24   rock wall that we think is impermeable, that is more than

25   50 feet thick.  Now, there are certain seismic tests that

1    can be run from the surface to show that the wall is intact

2    and so that the borehole re-drilled couldn't have caused the

3    flooding laterally into Bluestone's mine.

4        You know, they say a picture is worth a thousand words

5    and if we can get our experts down there and take water

6    samples and take photographs, we can prove definitively that

7    the borehole drilled by Pinnacle a couple of years ago had

8    nothing to do with the flooding in Bluestone's mine and

9    that, instead, the Bluestone flooding resulted from

10   Bluestone's own decision to shut off the deep water pump.

11       And this is really important and something Your Honor

12   ought to know.  There were deep water pumps in Bluestone's

13   mine that were responsible for pumping 4-500 million gallons

14   of water out of the mine every year and this was long before

15   Pinnace's borehole so that we are told is that when

16   Bluestone shut off its deep water pump that mine was going

17   to flood.  It was just a matter of time and we -- we believe

18   that that can be proved without speculation, without opinion

19   evidence, but with the use of hard facts, if we are given

20   permission by MSHA, which we have no reason to believe that

21   they'll refuse to get into the mine.

22       So, it's an enormous case and the physical inspection

23   of the property, separate and apart from ordinary discovery,

24   like depositions, document exchange, expert witnesses for

25   depositions, and so forth is, for us, a very central issue

```
 1    and that motion is pending before Judge Tinsley.  And so

 2    that's the only -- that's the incremental point I would add

 3    to the Court that may not have been made thus far in this

 4    hearing.

 5              THE COURT:  All right.  Anybody else on the

 6    defense side before I hear from Bluestone?

 7         All right.  Let's hear from Bluestone.

 8              MR. ROSE:  Your Honor, Dennis Rose for Cliffs.  I

 9    just want to mention one thing on the timing.  While this

10    case has a 2016 case number, Cliffs and Seneca, which are

11    basically the derivative claims being brought, we were not

12    brought into the case, issues weren't joined for us, until

13    the end of May of last year.  So, we weren't even in the

14    case for the first year in the case.  I just want to make

15    sure that the Court is aware that, for us, we've been in the

16    case for just about a year.

17              THE COURT:  All right.  Very well.  Let's hear

18    from Bluestone.

19              MR. LONG:  Your Honor, Scott Long, and I know Dave

20    Nelson is on the phone, as well, and he may want to chime

21    in.  Stating the obvious, our client's mine has been flooded

22    and we believe lost.  The nature of the losses and the

23    claims have been known to Pinnacle since at least 2015, and

24    Cliffs no later than 2016, we believe.  Each passing month,

25    we believe we're losing up to $2 million-plus.
```

1          In terms of the plan Mr. Berman talked about, there is

2     no plan.  He talked about a plan.  Your Honor, to this date,

3     no plan, no detail, has been provided.

4          It's correct that Judge Tinsley has the motion to

5     compel that's fully briefed.  We welcome the opportunity to

6     have him hear it.

7          He mentioned a picture speaks a thousand words.  We've

8     provided videos to them showing water pouring over this

9     supposedly permeable rock barrier.  There were witnesses

10    that were underground and they could testify to it that

11    they've chosen not to depose.

12         In terms of the request to inspect and motion to compel

13    which, by the way, Cliffs did not raise in its original

14    motion, I'd like to give the Court some context because it

15    is apparent to me that what appears to be happening is

16    there's -- they're continuing a motion to continue hearing

17    into the motion to compel hearing which is before Judge

18    Tinsley, as the Court knows.

19         For the first time, Pinnacle filed a notice of

20    inspection in late March asking that the mine be inspected,

21    knowing full well that it was flooded and closed by MSHA at

22    that time.  They set the inspection for April 23rd.  We

23    advised them again the mine is flooded.  It's closed.  They

24    responded with a motion to compel which essentially meant

25    that they want us, the plaintiff, to spend millions of

1     dollars to de-water, de-gas and rehab the mine for the

2     entirely of the working area so that they can inspect the

3     mine, the seals, the equipment lost, which is in the very

4     deepest part of the mine, and allegedly the borehole.  And

5     I'll turn to that in a second, Your Honor.

6          The notice was set for three weeks.  They were going to

7     inspect four months before the close of the deadline despite

8     knowing about this case since 2015.  We filed a complaint

9     for injunctive relief against them.  No plan provided.

10         And, to be precise, what the defendants really want is

11    to amend the scheduling order so that they can come up with

12    a plan, which they don't have, which they have not provided

13    to submit to MSHA for approval, which may not happen to

14    de-water, de-gas and rehab the mine that has been flooded

15    for more than three years at an unknown cost over an unknown

16    time period to perform the inspection primarily of the

17    borehole but, also, the deepest areas of the flooded mine.

18         I would like to stop there.  They talk about inspecting

19    the borehole, Your Honor.  It is an area of the mine that's

20    been sealed, second mine pillar, and the roof has collapsed.

21    The chief mining engineer for Pinnacle testified on

22    July 10th that that's not possible.  You can't go behind a

23    sealed area and they know it.

24         So, they've given us two expert affidavits saying it

25    can be done for $5-8 million, not one detail, no detail

1    provided.  That was back in May.  They say we should go to

2    MSHA.  Well, maybe they should come up with a plan to ask us

3    to ask MSHA if that could be done.  We made that decision a

4    long time ago and they provide nothing for that.  People put

5    their lives at risk.  Dave Altizer, who will be an expert in

6    this case, who provided a report before the litigation

7    before the working areas that were completely flooded that

8    said that you would put people's lives at risk if we tried

9    to do something like this.

10        Well, I would like to turn, if I could, Your Honor, to

11   the motion, I guess.  Cliffs essentially states in its

12   original motion that we've engaged in extensive written

13   discovery.  We agree with that.  We've responded to 266

14   interrogatories, including subparts, 309 requests for

15   documents, including subparts, 217 requests for admissions.

16   We've produced approximately 6,000 Bates numbered pages of

17   things which includes video folders, autocad files, Excel

18   spreadsheets, and Rule 26 disclosures.  We produced an

19   additional 2600 Bates numbered pages of documents and videos

20   that we obtained from Pinnacle and its contractors prior to

21   litigation.

22        We disagree vehemently to the extent they are

23   suggesting somehow it was our lack of effort that caused so

24   little deposition discovery to take place.  From the get-go,

25   even as late as yesterday when we were trying to provide

```
 1    dates for our witnesses for them, we have always heard we
 2    need to look at documents before we can take depositions and
 3    that's -- we continue to hear that.  I personally convened
 4    two conference calls for everybody in January and February
 5    to ask them to bring their calendars so we can pick dates so
 6    that we can work together.  With the exception of John
 7    MacCorkle and Diana Johnson, we got nothing except, "We need
 8    to look at documents."  They made it out to one deposition.
 9    Then they cancelled it and have not rescheduled it.  It is a
10    30(b) of ours.  Four times.  We recently took it on July 1.
11    I think it is important to note that we began to push hard
12    for depositions in late spring and the reports Cliffs --
13         (Telephonic interruption)
14              THE COURT:  Mr. Long?  Mr. Long?  Mr. Long?
15              MR. LONG:  Yes?
16              THE COURT:  There's somebody making a horrendous
17    noise on there.  I don't know if you've got papers.  It's
18    going on right now.
19              MR. LONG:  I heard it.  It's not me.
20              THE COURT:  Okay.  Whoever it is needs to mute
21    their phone.
22         Okay.  Go ahead, Mr. Long.
23              MR. LONG:  I'm sorry, Your Honor.  I think it's
24    important to note that, as I've said, when we started
25    pushing for depositions in late Spring and particularly when
```

```
 1    we divulged our expert reports, then two days, I think,

 2    after we did that, Cliffs approached us about mediation.

 3    They said let's focus on mediation, essentially stay

 4    everything for three weeks.  So, we agreed to reschedule

 5    Dave Trader (phonetic) again for the fourth time and we

 6    agreed to give a three-week extension to them for various

 7    deadlines.  We had already divulged our experts so that

 8    allowed them more time to divulge their experts.  We

 9    foolishly, or not, agreed, I might say, two days after

10    Cliffs served extensive discovery requests on us.  174

11    requests for admissions, 102 production of documents and,

12    depending on how you couch subparts, somewhere between

13    100-400 interrogatories.

14        The next date, the day before mediation, a second

15    notice to inspect came out and they wanted to do some type

16    of core drill.  No plan again submitted.  And then, two days

17    after mediation, Cliffs filed its motion to continue.

18        You know, I routinely serve as a mediator and, to say

19    the least, it was the most unproductive mediation I have

20    ever attended.

21        We got two more fact witnesses set, Your Honor, on

22    July 30th in Cleveland.  We believe counting -- they have

23    four experts.  Counting their experts, we have between six

24    and eight depositions from our viewpoint, but I'll be candid

25    with the Court.  You know, it's going to be tough.  We're
```

1    going to have to agree to it as lawyers, roll our sleeves

2    up, and do it.  I think it can be done.  Our clients want it

3    to be done, but it's going to be tough.

4        And I agree with defense counsel in that respect.  We

5    were approached at mediation and repeatedly thereafter by

6    Pinnacle about agreeing to a slight continuance.  You could

7    tell, I think, by our stern response to the motion to

8    continue that we were not going to agree to that, but at a

9    later point, there was discussion about possibly a slight

10   continuance and approaching the Court about a settlement

11   conference.

12       I do want to commend Pinnacle.  I think, here for

13   several years, for whatever reason, they pushed hard with

14   insurance carriers and I think they're making progress in

15   that respect.  Our thought was that if we could get a

16   settlement conference in August or early September with

17   directive to the adjustors to be present, it might be

18   productive.

19       We approached our clients with respect to that

20   possibility and, quite candidly, based upon our experience

21   with mediation, they are adamant that they want us to push

22   for a trial date and keep it in November.  Thank you, Your

23   Honor.

24           MR. BERMAN:  Your Honor, this is Josh Berman on

25   behalf of Pinnacle.  May I address one quick thing that Mr.

1   Long mentioned at the end with respect to the carriers?   It

2   may be helpful to the Court in the concept of this

3   discussion.   And I'll await for the appropriate time to

4   respond to anything else the Court may want to discuss.

5            THE COURT:   No, go ahead.

6            MR. BERMAN:   Thank you, Judge.   Mr. Long and Mr.

7   Nelson and I have had productive and I believe cooperative

8   conversations with respect to Pinnacle's recent efforts to

9   bring several hundred million of dollars, several hundred

10   million dollars, I should say, of insurance coverage to the

11   table.

12        Just prior to the July 4 holiday, my colleagues and I

13   were in Wilmington, Delaware meeting with Chub and I believe

14   we made substantial progress in bringing that particular

15   portion of the stack, the coverage stack, to the table.

16   There are other details that I won't burden the Court with

17   now, but we would certainly agree, and I understand that Mr.

18   Long's clients are not there.   We would certainly agree to

19   appear for a court-supervised -- with Pinnacle -- for a

20   court-supervised settlement hearing at an earlier date than

21   contemplated by the current present scheduling order.

22        And one major reason I -- in the notes, I wrote down an

23   additional reason that we would respectfully request another

24   120 days leniency, if you will, without prejudice to the

25   motion that's presently pending before Judge Tinsley, is

1    because we are extending a great deal of time and effort,

2    and I think probably with some success at getting these very

3    interested parties, namely the insurance companies, to the

4    table, if you will.

5        We've made real progress with Arch.  We've made real

6    progress with Chub.  But it's rather a labor-intensive

7    endeavor because, especially the excess layers, want to make

8    sure that we have very diligently attempted to approach

9    every primary carrier that may have carried any insurance

10   coverage in favor of Pinnacle and the other defendants.  So,

11   that would include the Target Drilling Company, the various

12   cementing companies, and all the subcontractors that may

13   have smaller policies, the good guys, the Chub, and Star,

14   and so forth that have $25 million-dollar paper, and up to

15   $50-million paper.  We want to be sure that we are

16   appropriately getting, you know, every dollar we can from

17   the smaller carriers that are -- that are primary.

18       And so, I personally, and my colleagues who are new to

19   the team -- and I understand the case has been pending

20   before Your Honor for a long time, but we have been very,

21   very aggressively and I hope diligently trying to pursue

22   that issue and I think that additional time is warranted

23   because that's really an all-parties interest, to have those

24   carry to the table.

25       And one of the problems at the mediation was that we

 1      didn't have, you know, this -- we didn't have the insurance

 2      carrier parties there at the table.  So, very difficult.

 3          I mean, let me just put this out there.  The number of

 4      -- the damages that are being sought against my client,

 5      Pinnacle, even a tenth of those damages are a bankruptcy

 6      matter.  You know, I could -- and the complaint talks about

 7      $600 million approximately of damages that has been revised

 8      some but, you know, even a $60 million judgment against

 9      Pinnacle, to the extent that it's joint and several, that's

10      it.  That's the end of our company.  And so, having

11      insurance coverage present is of utmost importance.

12          And then, you know, obviously, we have our responses to

13      what Mr. Long said in the motion to compel, but I thought

14      the insurance issue might be helpful to the Court in

15      evaluating the situation.

16          THE COURT:  Well, I appreciate that.  And some of

17      you will recall that, on the previous case between these two

18      sets of parties, I brought everybody in and we spent a

19      couple of days and then got it wrapped up.  I brought

20      everybody, including now Governor Justice in, and we got the

21      thing wrapped up.

22          I understand this is a somewhat different situation and

23      I'm -- at this stage, I'm not prepared to order a settlement

24      conference until everybody is in agreement.  Now, we get

25      closer to a trial date and I might consider doing that

1    early, but for the time being, unless everybody is in

2    agreement, I'm not inclined to do that.  Now, if you were in

3    agreement, I will make myself as available as possible to do

4    that, but just my sense of it is that, again, unless you're

5    in agreement, I'm not -- I don't think it's appropriate for

6    me to order a settlement conference, at this point, but I

7    appreciate that information.

8        Anybody else from --

9            MR. LONG:  This is Scott Long.  If I could, we

10   agree.  I'm not sure if everybody else wants to pipe in, but

11   we agree to that.

12           THE COURT:  Well, Mr. Long, I thought you said

13   your clients are adamantly opposed to it.

14           MR. LONG:  No, no.  They're not adamantly opposed

15   to a settlement conference.  They're adamantly opposed to a

16   trial continuance.  You know, as Josh said, he is willing to

17   move it up, but that's a different issue than that of the

18   trial date, Your Honor.

19           THE COURT:  Oh.  I misunderstood then.

20           MR. BERMAN:  Let me just clarify with counsel.

21   We're willing to move up, as part of -- Mr. Long and I had a

22   tentative discussion about doing a deal, if you will, Judge,

23   that included a four-month continuance on the deadlines and,

24   as a quid pro quo, if you will, we would agree to get our

25   clients in and, you know, move ahead and get the carriers in

1    maybe with Your Honor's assistance on that to an early

2    settlement date and my hope was to convey to Mr. Long good

3    faith by showing up at an earlier than scheduled settlement

4    conference supervised by the Court itself while at the same

5    time not having our backs quite so hard against the wall

6    relative to, you know, putting on a case to a jury that's

7    worth half a billion dollars.

8         So, that was our -- we'll be there, and we'll

9    participate in the best of faith but, you know, the request

10   we would have then is that we have either the additional --

11   we have the trial scheduled for March and not November so we

12   can get all the moving parts.  That's where we stand, Judge,

13   if that's helpful.

14             THE COURT:  Mr. Long, what do you say?

15             MR. LONG:  Your Honor, as I said before, it is our

16   client's instruction that they want us to insist on the

17   trial date as scheduled.

18             THE COURT:  Well, here's the concern I have, and

19   that is that I could set a settlement conference here in the

20   next, you know, six or eight weeks and -- and, as -- I'm

21   just thinking out loud here and, as counsel has suggested

22   then as a part of that, move the trial date back, and then I

23   could get everybody in and we all end up staring at each

24   other and then we have a result similar to the mediation.

25   So, I'm a little -- I'm a little hesitant to do that at this

```
 1    point.  I need to think about that.
 2         Well, let me ask you this.  If we were -- if we were
 3    going to have such a settlement conference led by me, when
 4    -- how soon could everybody be ready to do that?  Now, I
 5    know that -- I understand by asking that question that I may
 6    get, oh, you know, maybe March or April of next year or
 7    something, but I'm thinking about something in the next six
 8    to eight weeks.
 9         So, Mr. Long, what are your thoughts on that?
10              MR. LONG:  That would be fine with us, Your Honor.
11              MR. BERMAN:  Judge, this is Josh Berman.  Here's
12    the issue.  We, White & Case, and Steptoe, on behalf of
13    defendants, can get there in six to eight weeks, as well,
14    but it genuinely is difficult, especially in the summer
15    months, to make sure we've got the carriers, even if
16    proceeding under a reservation of rights.  So, I don't want
17    to say, yes, Judge, we'll be there in eight weeks' time.  I
18    almost want, you know, two to three weeks to make sure that
19    I can get Chub there and Star Indemnity there, and the other
20    insurance companies, because I think that would go a long
21    way towards making sure exactly what Your Honor is concerned
22    about, that we have another totally unproductive, you know,
23    meeting but, certainly -- and I think, from my standpoint,
24    that really only makes sense, to get in there in, let's say,
25    eight weeks.  I think that would be doable, eight to ten
```

1    weeks, but that really only makes sense if Your Honor is

2    willing to give us some breathing room on the trial because

3    I am going to have to spend the next six to eight weeks

4    getting back to Star Indemnity and -- and I don't have my

5    chart up in front of me -- and there are a whole bunch of

6    other policies and really spending a lot of time making sure

7    that the carriers can get there.

8         You know, this looming issue of the motion to compel

9    and, in some respects, I mean, I don't think Your Honor

10   wants to hear about that at the moment.  I'm willing to

11   address what Mr. Long said whenever the Court is willing to

12   take that up.  We still think that's a critical issue.  But

13   all of this can be done, I would submit, respectfully,

14   without deciding today on the motion to compel.

15        We could get a settlement conference supervised by you

16   within eight to ten weeks.  I may need the Court's help,

17   frankly, in getting an order to have the insurance companies

18   present, that will make a big difference, without prejudice

19   to whatever rights they may reserve to decline coverage, but

20   let's get them there.

21        And then, you know, so that I'm not panicked about

22   putting on a case to a jury and getting all of these

23   depositions done at the same time, but going into a trial in

24   March.  While I understand, even from my first experience

25   with Your Honor, that this is not going to be additional

1    extensions of time barring the Court granting our motion to

2    compel and barring, you know, the actual process.

3        So, I think I've heard between the lines what Your

4    Honor is saying quite clearly about moving forward.  I hope

5    that was helpful.

6            THE COURT:  Well, here's what I'm thinking about

7    doing.  The -- it sounds to me like, assuming we could get

8    everybody in, that there's some general agreement on having

9    a settlement conference maybe toward the end of September.

10   And I recognize that that is going to be a bit of an

11   undertaking.  And so, what I'm thinking is that, if we do

12   that, then I will at least, for the time being, grant a

13   60-day continuance.  I'm not deciding that right now.  I'm

14   actually taking that under advisement.  I actually might

15   have you all come back in about a week to see how things are

16   before I do it but, right now, that's what I'm entertaining.

17   I really am interested in hearing about the efforts to get

18   insurance carriers here and we can talk about an appropriate

19   order for that purpose, but that's what I'm thinking about

20   doing now.  My thought is that we -- you can tell your

21   clients and insurance carriers and whatnot that that's what

22   the judge is thinking about doing and then we get back

23   together on the phone in a week and see where things stand.

24   Does anybody have any objection to that approach?

25           MR. LONG:  No, sir.

1          MR. BERMAN:  No, sir.  I might ask one more thing,

2     if it makes sense to the Court.  This -- the motion to

3     compel really fits together with everything that's before

4     Your Honor.  Does it make sense to the Court for you, Judge,

5     to take up the motion to compel rather than to have that

6     proceed separately before Judge Tinsley because, you know,

7     we've -- they are technically different motions under the

8     Federal Rules, but they all relate and the motion to compel

9     -- the motions that are before the Court really are part and

10    parcel of the same issue, namely, the trial schedule, and

11    one we'll get before a jury if we're not able to resolve

12    this with the insurance companies and mediation.

13          THE COURT:  Well, here's what I would say about

14    that.  First of all, Judge Tinsley has much more experience

15    with dealing with discovery issues.  I rarely see them.

16       Secondly, I don't know how much time he and his staff

17    have got into this particular issue, but there may be some,

18    in which case it would be a duplication for me to get

19    involved with it.

20       Now, I mean, if he -- regardless of which way he rules,

21    one party or another could appeal to me, but the standard on

22    that is almost impossibly high and I don't think there's

23    ever been a time that I have reversed a magistrate judge's

24    decision on a discovery matter.  As you can imagine, that's

25    not the sort of thing I want to really encourage.  So, I

1    understand your point, and I'll give it some thought, but I

2    kind of doubt that I'm going to do that.

3         MR. BERMAN:  No, I understand.  I just was trying

4    to think about it.  And I appreciate Your Honor's point.

5    I'm just trying to think about a way to avoid this scenario

6    where we're going forward along Your Honor's suggested time

7    table schedule and then we get an order from Judge Tinsley

8    granting us access to the mine and the whole timetable blown

9    up.

10        Because I understand that Your Honor wants to proceed

11   with all -- you know, do this expeditiously.  And so, I hear

12   you, Judge, and we will -- we can make the appropriate

13   application to Judge Tinsley, if necessary.

14        THE COURT:  All right.  Anybody else have any

15   objection to what I have proposed?

16        MR. ROSE:  Your Honor, Dennis Rose for Cliffs.

17   Can I just get a couple of things on the mediation issue?

18   Bear with me just for a few minutes.  We did suggest in

19   mediation, you may recall, the motion that was filed to

20   approve a part of the settlement.  Both Pinnacle and the

21   plaintiffs suggested that mediation would be a good idea and

22   we approved saying, well, I believe as the two main parties

23   in this case agree it's a good idea, we should have it.  We

24   did have -- Chub was on the phone, but they were there.

25   They are the first layer of the excess carrier.  We also had

1    representatives from AIG, who is the primary there; albeit

2    on the phone, they were in the room.

3        My understanding of what happened is, because of this,

4    the issues with Pinnacle, they had not gotten with the

5    carriers that we had on what their position was and that was

6    a hold-up.  I am very pleased to hear from Mr. Berman that

7    they've made progress.

8        This is a somewhat unique case, Your Honor, because

9    there are two insurers.  Cliffs is insured by this policy,

10   as well as Pinnacle, and when the original case was filed,

11   the TRO case, Pinnacle was a subsidiary of Cliffs.  In the

12   interim, Pinnacle was acquired by Seneca.  So, Seneca is now

13   the owner of Pinnacle, insured by the policy procured by

14   Cliffs.  This has complicated everything in trying to get

15   insurance on the line.  I don't think it's anyone's fault.

16   It's just made it a lot harder.

17       Cliffs is in agreement, if we can get to court and get

18   everybody there with the carriers in eight weeks or so, I

19   think that is good.  But, right now, we have deadlines that

20   are fast approaching that I think the parties are operating

21   as if we've got to try to get things done in August, but it

22   would help if the Court would officially extend these

23   deadlines.

24           THE COURT:  Well, I can tell you one thing.  If we

25   have this settlement conference, everybody is going to be

```
 1   here in person.  There will be no participation by
 2   telephone.
 3       Anybody else have anything to add on what I've
 4   suggested?
 5       All right.  Hearing none, I think what I'll do is, I'll
 6   issue an order setting up another conference call sometime
 7   next week, and we'll see where we stand at that point, but
 8   that is what I'm leaning toward doing, but I'm not going to
 9   make a ruling until next week.
10       Does anybody else have anything we need to take up
11   today?
12       Hearing none --
13           MR. BERMAN:  No, sir.
14           THE COURT:  I'm sorry?
15           MR. BERMAN:  I said no, Your Honor.
16           THE COURT:  Yeah.  I don't need everybody to say
17   no.  If you have something --
18           MR. BERMAN:  Okay.
19           THE COURT:  -- that we need to take up, speak now,
20   or forever hold your peace.
21       Hearing none, you all have a good weekend.
22           MR. LONG:  Thank you, Judge.
23           MR. BERMAN:  Thank you, Your Honor.
24       (Proceedings concluded at 2:45 .m., July 20, 2018.)
25
```

```
1    CERTIFICATION:

2         I, Ayme A. Cochran, Official Court Reporter, certify

3    that the foregoing is a correct transcript from the record

4    of proceedings in the matter of Bluestone Coal Corp., et

5    al., Plaintiff v. Pinnacle Mining Co., LLC, et al.,

6    Defendant, Civil Action No. 2:16-cv-06098, as reported on

7    July 20, 2018.

8

9    s/Ayme A. Cochran, RMR, CRR              September 20, 2018

10   Ayme A. Cochran, RMR, CRR                        DATE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```